17-3903-ag
*Hernandez-Chacon v. Barr*

BIA
Tsankov, IJ
A 206 803 023

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2019

(Argued: September 10, 2019        Decided: January 23, 2020)

Docket No. 17-3903-ag

---

ROSARIO DEL CARMEN HERNANDEZ-CHACON,

*Petitioner*,

v.

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

*Respondent.*

---

Before:

WESLEY, CHIN, and BIANCO, *Circuit Judges.*

---

Petition for review of a decision of the Board of Immigration

Appeals dismissing petitioner's appeal from an immigration judge's denial of her

application for asylum.  Petitioner contends that she is entitled to asylum because

if she is returned to El Salvador, she will be persecuted on account of her membership in a particular social group -- Salvadoran women who have resisted the sexual advances of a gang member -- and political opinion -- resistance to the norm of female subordination to male dominance that pervades El Salvador. We agree that petitioner failed to establish her asylum claim based on membership in a particular social group, but we grant the petition for review with respect to her political opinion claim and remand to the Board of Immigration Appeals for further proceedings.

Petition GRANTED and case REMANDED.

---

HEATHER YVONNE AXFORD, Central American Legal Assistance, Brooklyn, New York, *for Petitioner*.

CARMEL A. MORGAN, Trial Attorney (Shelley R. Goad, Assistant Director, Office of Immigration Litigation, *on the brief*), for Joseph H. Hunt, Assistant Attorney General, Civil Division, U.S. Department of Justice, Washington, D.C., *for Respondent*.

---

CHIN, *Circuit Judge*:

Petitioner Rosario Del Carmen Hernandez-Chacon ("Hernandez-Chacon"), a citizen of El Salvador, seeks review of a decision of the Board of Immigration Appeals (the "BIA") dismissing her appeal from a decision of an immigration judge (the "IJ") granting her protection under the Convention Against Torture ("CAT") but denying her application for asylum. Although she has been granted CAT relief, Hernandez-Chacon continues to pursue her asylum claim because asylum would provide her with broader relief, including permanent residence and a path to citizenship. *See* 8 U.S.C. § 1159.

While in El Salvador, Hernandez-Chacon was attacked twice by members of a gang. The first attack involved a man who attempted to rape her in her home. The second attack involved the same man, along with two other men, who attempted to rape her while she was walking with her daughters. Hernandez-Chacon contends that she is entitled to asylum because if she is returned to El Salvador she will be persecuted based on her membership in a particular social group -- Salvadoran women who have resisted the sexual advances of a gang member -- and political opinion -- resistance to the norm of

female subordination to male dominance that pervades El Salvador.  The agency

rejected both claims for asylum.

While we agree that Hernandez-Chacon failed to establish her

asylum claim based on membership in a particular social group, we conclude

that the agency did not adequately consider her political opinion claim.

Accordingly, we grant the petition for review with respect to her political

opinion claim and remand for further proceedings.

*STATEMENT OF THE CASE*

A.    *The Facts[1]*

In 2013, Hernandez-Chacon, who was then twenty-nine years old,

was living with her two daughters, who were three and twelve years old, in

Chalatenango, El Salvador.  Her "partner," Oscar Valdez, was not present, as he

was living and working in the United States.[2]  One night in late August or early

---

[1]    As the BIA did not disturb the IJ's finding that Hernandez-Chacon was credible, "we treat the events [s]he experienced in the past as undisputed facts." *Castro v. Holder*, 597 F.3d 93, 99 (2d Cir. 2010) (quoting *Delgado v. Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007)).

[2]    The partner,Valdez, was the father of Hernandez-Chacon's younger daughter. He had relocated to the United States in approximately 2012 "to work to better support" Hernandez-Chacon, their daughter, and his stepdaughter.  He and Hernandez-Chacon were married in 2016.  Cert. Adm. Rec. at 269.

-4-

September, while Hernandez-Chacon and her daughters were home alone, a man whom she did not know entered an open hallway of the house, where she was washing dishes. He was drunk and said he wanted to have sex with her. When she told him no, he grabbed her and tried to force himself on her. She managed to escape and ran to an interior room, locking herself inside. He eventually left. As Hernandez-Chacon would later testify, she said "no" to the man even though she knew that "resisting his advances would put [her] in danger." Cert. Adm. Rec. at 193. She resisted, she explained, "because I have every right to." *Id*. She did not report the attack to the police because she did not believe the police would do anything.

Three days later, Hernandez-Chacon was attacked by the man again. She was walking with her two daughters when three men wearing masks suddenly came out of a nearby cemetery. One of them said to her that "since [she] didn't want to do this with him in a good way, it was going to happen in a bad way." *Id*. at 186. She recognized his voice as that of the man who had attacked her a few days earlier. Another of the men had a tattoo on his arm, the symbol of the Mara Salvatrucha ("MS") gang. They grabbed her and pulled her into the cemetery, leaving her daughters on the street. As the men "started to

take [her] by force," she began to scream. *Id*. at 187. She could hear her older daughter screaming as well. As Hernandez-Chacon continued to shout and resist, they spit on her and beat her with a piece of metal. She lost consciousness. She eventually woke up in a clinic; three people had interceded in response to her daughter's cries for help, and had taken her to the clinic. Hernandez-Chacon was treated for a broken collarbone and received pain medication. She was eventually transferred by ambulance to a hospital. A medical certification shows that Hernandez-Chacon was treated at the hospital on September 2, 2013, for a fracture of the right clavicle.

When Hernandez-Chacon returned home from the hospital, she found a note under her door, from her attackers, warning that if she went to the police, "they were going to kidnap her [daughter] and that they were going to rape her and kill her and pull out her tongue." *Id*. at 190. Again, she did not go to the police because she believed the police would not help her. After the attack, she did not leave her house very often, and never alone, as she was afraid the gang members "would do something to me and my daughters." *Id*. at 191-92.

After the attacks, Hernandez-Chacon and her partner spoke by telephone and they agreed that she would leave El Salvador and join him in the

United States as soon as they were able to put together sufficient resources for her to join him. In May 2014, Hernandez-Chacon and her younger daughter Gladis, who was then almost four years old, left El Salvador, traveling through Guatemala and Mexico, reaching the United States in June 2014. She left her thirteen-year old daughter, Maria, in El Salvador because she only had enough money to bring one of the girls, and her sister-in-law had agreed to take care of Maria.

On June 15, 2014, Hernandez-Chacon and Gladis entered the United States without inspection and were apprehended at the border; they were served with a Notice to Appear for removal proceedings and were released from custody. They applied for asylum, withholding of removal, and CAT relief. As Hernandez-Chacon explained in the application, she was attacked by three men who attempted to rape her and broke her collarbone in the process, in retaliation for her resisting an earlier attempt to rape her. She explained that she believed that if she returned to her home country she would be raped or killed by members of the MS gang because she had twice resisted their attempts to rape her. She later elaborated: "I believe that if I go back to El Salvador, the gang members who twice tried to rape me and broke my collar bone, will not let me

live if they see me again. They punished me brutally after the first time I resisted the sexual advances of one of them and this time will be even worse." *Id*. at 254.

**B.**     *The IJ Decision*

Before the IJ, Hernandez-Chacon argued that she was eligible for asylum based on her membership in a particular social group and her political opinion. Regarding her social group claim, Hernandez-Chacon alleged that she was persecuted for being a member of the group of either (1) "Salvadoran women who have rejected the sexual advances of a gang member" or (2) "Salvadoran women who are viewed as property." *Id.* at 151. She also argued that she was persecuted for her feminist political opinion, and specifically her resistance to male domination in Salvadoran society.

On October 19, 2016, the IJ issued a decision granting Hernandez-Chacon relief under CAT but denying her asylum claim. The IJ found Hernandez-Chacon to be "a credible witness." *Id*. at 150. The IJ held that Hernandez-Chacon met her burden of proving that the Salvadoran government would not be able to protect her from gang members if she were to return to El Salvador and it was more likely than not that she would be tortured if she returned home. The IJ found that the record supported Hernandez-Chacon's

-8-

claim that there was "widespread corruption and a number of human rights problems in El Salvador." *Id*. at 155. The IJ also found that she presented documentary evidence supporting her claim of suffering a major medical event, including the beating by the three men, the attempted rapes, and the broken collarbone, as well as the threats to kill her and her daughter if she reported the incidents to the police. On that basis, the IJ granted her request for withholding of removal under Article 3 of CAT. The IJ also granted her daughter Gladis's application for asylum.

Nonetheless, the IJ rejected Hernandez-Chacon's asylum claims. The IJ found that the proposed social groups -- (1) Salvadoran women who have rejected the sexual advances of a gang member and (2) Salvadoran women who are viewed as property -- had not been recognized by the BIA as being protected social groups. The IJ also rejected Hernandez-Chacon's political opinion claim, concluding: "In this case [Hernandez-Chacon] did not advance a political opinion. I find that she simply chose not to be the victim and chose to resist being a victim of a criminal act." *Id*. at 154.

In her decision, the IJ reviewed relevant country conditions in El Salvador, including the prevalence of violence against women and "the dreadful

practice of El Salvador's justice system to favor aggressors and assassins and to punish victims of gender violence." *Id*. at 147. The IJ relied on the declaration of Aracely Bautista Bayona, a lawyer and human rights specialist, who described "the plight of women in El Salvador," *id*.,[3] and recounted the following:

One of "the most entrenched characteristics of Salvadoran society is machismo, a system of patriarchal gender biases which subject women to the will of men. Salvadorans are taught from early childhood that women are subordinate." *Id*. Salvadoran society "accepts and tolerates men who violently punish women for violating these gender rules or disobeying male relatives." *Id*. Indeed, in El Salvador, "femicide remain[s] widespread." *Id*. at 148; *see also* U.S. Dep't of State, Bureau of Democracy, H. R. and Labor, Country Reports on Human Rights Practices for 2015 for El Salvador (2015) ("Country Report"). Gangs in El Salvador view women as the property of men, and gang violence against women outside the gang "manifest[s] itself in a brutality that reflects these extreme machismo attitudes." Cert. Adm. Rec. at 148.

---

[3] The IJ noted that Bayona had "for more than two and a half decades worked and advocated for the rights of women, children, adolescents and youth in the migrant population in El Salvador." Cert. Adm. Rec. at 138.

"El Salvador has the highest rate in the world [of femicide] with an average of 12 murders for every 100,000 women." *Id*. at 148-49. As an article on El Salvador's gangs concluded, "in a country terrorized by gangsters, it is left to the dead to break the silence on sexual violence . . . , to the bodies of dead women and girls pulled from clandestine graves, raped, battered and sometimes cut to pieces. They attest to the sadistic abuse committed by members of street gangs." *Id*. at 149 (quoting *El Salvador's Gangs Target Women and Girls*, Associated Press, Nov. 6, 2014).

As the State Department has found, rape, sexual crimes, and violence against women are significantly underreported because of societal and cultural pressures on victims and fear of reprisal, and the laws against rape "are not effectively enforced." Country Report at 7. Police corruption in El Salvador is well-documented, including involvement in extra-judicial killings and human rights abuses. *See id.* at 1. The judicial system is also corrupt. While the law provides criminal penalties for official corruption, "the government d[oes] not implement the law effectively, and . . . officials, particularly in the judicial system, often engage[] in corrupt practices with impunity." *Id.* at 6. "Like Salvadoran society as a whole, law enforcement officials, prosecutors, and judges

-11-

discriminate against women, reduce the priority of women's claims, and otherwise prevent women from accessing legal protections and justice. This results in impunity for aggressors, which reinforces aggressors' perception that they can inflict violence without interference or reprisal." Cert. Adm. Rec. at 300-01.

The IJ observed that Hernandez-Chacon's experiences were "generally consistent with the background materials she has submitted in regards to pervasive brutal attacks by El Salvadoran gangs." *Id*. at 149-50.

C.    *The BIA's Decision*

Hernandez-Chacon appealed the IJ's decision to the BIA.[4] As to the social group claim, she relied only on her first proposed social group -- Salvadoran women who rejected the sexual advances of a gang member. She continued to press the political opinion claim. On November 6, 2017, the BIA affirmed the IJ's decision. *In re Rosario Del Carmen Hernandez-Chacon*, No. A 206 803 023 (B.I.A. Nov. 6, 2017), *aff'g*, No. A 206 803 023 (Immig. Ct. N.Y. City Oct.

---

[4]    The government appealed the IJ's decision to the extent it granted CAT relief to Hernandez-Chacon and asylum to Gladis. The BIA affirmed the IJ's grant of CAT relief to Hernandez-Chacon but sustained the government's appeal with respect to the grant of asylum to Gladis, remanding the matter to the IJ. Gladis's proceedings have since been severed, and only Hernandez-Chacon's claim for asylum is before this Court.

19, 2016).  The BIA held that the proposed social group of Salvadoran women who rejected the sexual advances of a gang member lacked particularity and social distinction, concluding that Hernandez-Chacon had not demonstrated that women who reject the sexual advances of a gang member are perceived by Salvadoran society as a discrete group.  The BIA disposed of Hernandez-Chacon's political opinion claim in a footnote, rejecting the claim "for the reasons stated in the [IJ]'s decision."  *Id*. at 5 n.3.

This petition for review followed.

## *DISCUSSION*

### A. *Applicable Legal Standards*

Asylum is a discretionary form of relief granted to refugees, that is, individuals who are unwilling or unable to return to their native country because of persecution or a well-founded fear of persecution.  8 U.S.C. §§ 1101(a)(42), 1158(b); *see Guan Shan Liao v. U.S. Dep't of Justice*, 293 F.3d 61, 66 (2d Cir. 2002). The applicant has the burden of proving eligibility for asylum.  *See* 8 U.S.C. § 1158(b)(1)(B).

To demonstrate eligibility, "the applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion

-13-

was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i).  If an applicant demonstrates past persecution on account of a protected ground, a rebuttable presumption arises that the applicant has a well-founded fear of future persecution.  *See* 8 C.F.R. § 1208.13(b)(1).  Absent evidence of past persecution, an applicant must show that she subjectively fears persecution and that the fear also is objectively reasonable.  *Ramsameachire v. Ashcroft*, 357 F.3d 169, 178 (2d Cir. 2004).  A fear is objectively reasonable "even if there is only a slight, though discernible, chance of persecution."  *Diallo v. INS*, 232 F.3d 279, 284 (2d Cir. 2000) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).

"[A]sylum may be granted where there is more than one motive for mistreatment, as long as at least one central reason for the mistreatment is on account of a protected ground."  *Acharya v. Holder*, 761 F.3d 289, 297 (2d Cir. 2014) (internal quotation marks omitted).  Moreover, "[d]irect governmental action is not required for a claim of persecution.  Private acts can constitute persecution if the government 'is unable or unwilling to control it.'"  *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014) (quoting *Rizal v. Gonzales*, 442 F.3d 84, 92 (2d Cir. 2006)).

-14-

In the circumstances of this case, the Court reviews the IJ's decision as supplemented by the BIA. *See Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). The applicable standards of review are well established. *See* 8 U.S.C. § 1252(b)(4)(B). "Questions of law, as well as the application of legal principles to undisputed facts, are reviewed *de novo*." *Paloka*, 762 F.3d at 195. Specifically, legal determinations, such as whether a group constitutes a "particular social group," are reviewed *de novo*. *Id*. The agency's findings of fact are reviewed under a substantial evidence standard. *See Xiu Xia Lin v. Mukasey*, 534 F.3d 162, 165 (2d Cir. 2008) (per curiam).

## B.   *Application*

We conclude that the agency did not err in finding that Hernandez-Chacon failed to establish her social group claim, but we grant the petition with respect to her political opinion claim and remand for further proceedings.

### 1.   *Social Group*

To constitute a particular social group, a group must be: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (B.I.A. 2014); *see also Ucelo-*

*Gomez v. Mukasey*, 509 F.3d 70, 72-74 (2d Cir. 2007) (per curiam). "A particular

social group is comprised of individuals who possess some fundamental

characteristic in common which serves to distinguish them in the eyes of a

persecutor -- or in the eyes of the outside world in general." *Gomez v. INS*, 947

F.2d 660, 664 (2d Cir. 1991); *see also Paloka*, 762 F.3d at 196 (finding group must be

"'recognizable' as a discrete group by others in the society"); *Ucelo-Gomez*, 509

F.3d at 73 (noting that "the definition of the social group must have particular

and well-defined boundaries"). Here, the agency did not err in concluding that

Hernandez-Chacon's asserted social group -- El Salvadoran women who have

rejected the sexual advances of a gang member -- was not cognizable.

Hernandez-Chacon failed to provide sufficient evidence that her

proposed subset of Salvadoran women was a socially distinct group in

Salvadoran society. The country conditions evidence addresses widespread

violence against women in El Salvador, but it does not discuss whether women

who reject the sexual advances of gang members are perceived as a distinct

group in society or are at greater risk than anyone else who refuses to comply

with a gang member's demands. *See Ucelo-Gomez*, 509 F.3d at 73 ("When the

harm visited upon members of a group is attributable to the incentives presented

-16-

to ordinary criminals rather than to persecution, the scales are tipped away from considering those people a 'particular social group . . . .'").  Accordingly, we hold that the IJ did not err in finding that Hernandez-Chacon failed to demonstrate that she faces persecution on account of her membership in a particular social group.[5]

### 2.    *Political Opinion*

To demonstrate that persecution, or a well-founded fear of persecution, is on account of an applicant's political opinion, the applicant must show that the persecution "arises from his or her own political opinion." *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 545 (2d Cir. 2005).  Thus, the applicant must "show, through direct or circumstantial evidence, that the persecutor's motive to persecute arises from the *applicant's* political belief." *Id.*  (emphasis added).  The

---

[5]    *See Vega-Ayala v. Lynch*, 833 F.3d 34, 40 (1st Cir. 2016) ("Vega-Ayala's general reference to the prevalence of domestic violence in El Salvador does little to explain how 'Salvadoran women in intimate relationships with partners who view them as property' are meaningfully distinguished from others within Salvadoran society.").  *But see Alvarez Lagos v. Barr*, 927 F.3d 236, 252-55 (4th Cir. 2019) (remanding for agency to consider whether "group of unmarried mothers living under the control of gangs in Honduras qualifies as a 'particular social group,'" where record contained evidence that gang in question did "indeed target victims on the basis of their membership in a socially distinct group of unmarried mothers").

persecution may also be on account of an opinion *imputed* to the applicant by the persecutor, regardless of whether or not this imputation is accurate. *See Delgado v. Mukasey*, 508 F.3d 702, 706 (2d Cir. 2007) ("[A]n imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground for political persecution." (internal quotation mark omitted) (quoting *Chun Gao v. Gonzales*, 424 F.3d 122, 129 (2d Cir. 2005)). The BIA has explained that persecution based on political opinion is established when there is "direct or circumstantial evidence from which it is reasonable to believe that those who harmed the applicant were in part motivated by an assumption that [her] political views were antithetical to those of the government." *Matter of S-P-*, 21 I. & N. Dec. 486, 494 (B.I.A. 1996); *see also Vumi v. Gonzalez*, 502 F.3d 150, 157 (2d Cir. 2007).

Here, Hernandez-Chacon contends that if she is returned to El Salvador she will be persecuted by gang members because of her political opinion -- her opposition to the male-dominated social norms in El Salvador and her taking a stance against a culture that perpetuates female subordination and the brutal treatment of women. She argues that when she refused to submit to the violent advances of the gang members, she was taking a stance against a culture of male-domination and her resistance was therefore a political act.

There is ample evidence in the record to support her claim.[6] Gangs control much of El Salvador, including the neighborhood in which Hernandez-Chacon lived. The law enforcement systems that would normally protect women -- police, prosecutors, judges, officials -- do not have the resources or desire to address the brutal treatment of women, and the Salvadoran justice system "favors aggressors and assassins" and "punish[es] victims of gender violence." Cert. Adm. Rec. at 147. Yet, Hernandez-Chacon testified that when the first gang member tried to rape her, she resisted "because [she had] every right to." *Id*. at 193. Three days later, when the same man and two other gang members attacked her, she again resisted, to the point where they beat her until she lost consciousness. She argues that the men targeted her for the second attack -- and beat her so brutally -- because she had resisted the advances of an MS gang member and they believed she needed to be punished for her act of defiance. Her now husband likewise stated in his affidavit that Hernandez-Chacon will be attacked if she returns to El Salvador because "[s]he has managed to fight them off twice, but that just makes them angrier and if she shows her

---

[6]     At oral argument, the government forthrightly conceded that it was a "permissible" inference that Hernandez-Chacon was persecuted for her feminist political ideology, though it argued that the record did not compel that result.

face again, I think they could kill her." *Id*. at 269.

While the IJ's decision was thorough and thoughtful overall, her analysis of Hernandez-Chacon's political opinion claim was cursory, consisting of the following:

> [Hernandez-Chacon] has also claimed that she had a political opinion. I cannot conclude that her decision to resist the advances of an individual is sufficient to establish that she has articulated a political opinion. In trying to analyze a political opinion claim, the Court has to consider the circumstances under which a respondent not only possessed a political opinion, but the way in which the circumstances under which she articulated that political opinion. In this case she did not advance a political opinion. I find that she simply chose not to be the victim and chose to resist being a victim of a criminal act.

*Id*. at 153-54.

The BIA dismissed Hernandez-Chacon's political opinion argument in a single sentence, in a footnote, rejecting the claim "for the reasons stated in the [IJ's] decision." *Id*. at 5 n.3. The analysis of both the IJ and the BIA was inadequate. *See Yueqing Zhang*, 426 F.3d at 548-49 (granting petition for review and remanding case to agency where IJ failed to undertake the "complex and contextual factual inquiry" necessary to determine if persecution was on account of political opinion). We have three areas of concern.

-20-

First, the agency concluded that Hernandez-Chacon "did not advance a political opinion."  Cert. Adm. Record at 154.  But this Circuit has held that the analysis of what constitutes political expression for these purposes "involves a 'complex and contextual factual inquiry' into the nature of the asylum applicant's activities in relation to the political context in which the dispute took place."  *Castro v. Holder*, 597 F.3d 93, 101 (2d Cir. 2010) (quoting *Yueqing Zhang*, 426 F.3d at 548).  We have held, for example, that resisting corruption and abuse of power -- including non-governmental abuse of power -- can be an expression of political opinion. *See Castro*, 597 F.3d at 100 (noting that "opposition to government corruption may constitute a political opinion, and retaliation against someone for expressing that opinion may amount to political persecution"); *Delgado*, 508 F.3d at 706 (holding that refusing to give technical assistance to the FARC in Columbia can be expression of political opinion); *Yueqing Zhang*, 426 F.3d at 542, 546-48 (holding that retaliation for opposing corruption of local officials can constitute persecution on account of political opinion); *Osorio v. INS*, 18 F.3d 1017, 1029-31 (2d Cir. 1994) (holding that "union activities [can] imply a political opinion," and not merely economic position).  The Fourth Circuit has recently recognized that the refusal to acquiesce to gang violence can constitute

an expression of political opinion. *See Alvarez Lagos*, 927 F.3d at 254-55 (where record contained evidence that gang in question would view refusal to comply with demand for sex as "political opposition," refusal to acquiesce to gang violence and flight to United States could demonstrate imputed anti-gang political opinion that constitutes protected ground for asylum). Here, the agency did not adequately consider whether Hernandez-Chacon's refusal to acquiesce was -- or could be seen as -- an expression of political opinion, given the political context of gang violence and the treatment of women in El Salvador.

Second, the IJ concluded that Hernandez-Chacon "simply chose to not be a victim." Cert. Adm. Rec. at 154. But even if Hernandez-Chacon was motivated in part by her desire not to be a crime victim, her claims do not necessarily fail, as her political opinion need not be her only motivation. *See* 8 U.S.C. § 1158(b)(1)(B)(i) ("The applicant must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be *at least one central reason* for persecuting the applicant." (emphasis added)); *Osorio*, 18 F.3d at 1028 ("The plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion."); *see also Vumi*, 502 F.3d at 158 (remanding to

-22-

agency where BIA failed to engage in mixed-motive analysis). While Hernandez-Chacon surely did not want to be a crime victim, she was also taking a stand; as she testified, she had "every right" to resist. As we have held in a different context, "opposition to endemic corruption or extortion . . . may have a political dimension when it transcends mere self-protection and represents a challenge to the legitimacy or authority of the ruling regime." *Yueqing Zhang*, 426 F.3d at 547-48. Here, Hernandez-Chacon's resistance arguably took on a political dimension by transcending mere self-protection to also constitute a challenge to the authority of the MS gang.

Third, the agency did not consider whether the gang members imputed a political opinion to Hernandez-Chacon. This Circuit has held that "an imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the Immigration and Nationality Act." *Vumi*, 502 F.3d at 156 (citations omitted); *see Chun Gao*, 424 F.3d at 129 (in case of imputed political opinion, question is "whether authorities would have *perceived* [petitioner] as [a practitioner of Falun Gong] or as a supporter of the movement because of his activities"). Here, the IJ erred in her political opinion analysis by only considering whether Hernandez-

Chacon "advance[d]" a political opinion. Cert. Adm. Rec. at 154. The IJ failed to consider whether the attackers imputed an anti-patriarchy political opinion to her when she resisted their sexual advances, and whether that imputed opinion was a central reason for their decision to target her. *See Castro*, 597 F.3d at 106 (holding that to properly evaluate a claim of political opinion, IJ must give "careful consideration of the broader political context"). In fact, as the gang members attacked her the second time, one of them told her that because she would not "do this with him in a good way, it was going to happen in a bad way," Cert. Adm. Rec. at 186, which suggests that the gang members wanted to punish her because they believed she was taking a stand against the pervasive norm of sexual subordination.

We note that the Fourth Circuit recently granted a petition for review in a case involving a woman in Honduras who was threatened by a gang in similar circumstances. The Fourth Circuit concluded that if, as the petitioner alleged, the gang had imputed to her "an anti-gang political opinion, then that imputed opinion would be a central reason for likely persecution if she were returned to Honduras." *See Alvarez Lagos*, 927 F.3d at 251. The court held that the IJ erred by not considering the *imputed* political opinion claim, that is,

whether the gang *believed* that the petitioner held an anti-gang political opinion. *Id*. at 254. Likewise, here, the agency did not adequately consider Hernandez-Chacon's imputed political opinion claim.

Accordingly, we hold that the agency erred in failing to adequately consider Hernandez-Chacon's claim of persecution or fear of persecution based on actual or imputed political opinion.

## *CONCLUSION*

For the reasons set forth above, the petition is GRANTED with respect to Hernandez-Chacon's political opinion claim and the case is REMANDED to the BIA for proceedings consistent with this opinion.