17-2898-ag
*Martinez De Artiga v. Barr*

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term 2019

(Argued: January 8, 2020          Decided: June 10, 2020)

Docket No. 17-2898-ag

————

PATRICIA XIOMARA MARTINEZ DE ARTIGA, NOE
ANTONIO ARTIGA MARTINEZ,

*Petitioners,*

*v.*

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

*Respondent.*

————

Before: KEARSE, CALABRESI, and POOLER, *Circuit Judges*.

Patricia Xiomara Martinez De Artiga challenges the denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). Martinez listed her son as a derivative beneficiary on her application. The Immigration Judge (IJ) found that Martinez testified credibly regarding serious, individualized threats against her and her children by the infamous Mara Salvatrucha (MS-13) gang. Nevertheless, the IJ denied Martinez's claims for asylum and withholding, concluding that the gang targeted Martinez because she had frustrated the gang's recruitment efforts and not on account of membership in her son's family. On the issue of CAT protection, the IJ determined that Martinez failed to meet her burden for relief because she fled El Salvador promptly after MS-13 threatened her. We hold that the IJ erred as a matter of law when it penalized Martinez for her

prompt flight, and we cannot confidently predict that a remand would be futile. We therefore DENY the government's motion for summary denial, GRANT Martinez's petition for review, and REMAND the case. Judge Kearse dissents in a separate opinion.

————————————————

REBECCA R. PRESS, UnLocal, Inc., Community Immigration Legal Services, New York, NY, *for Petitioners*.

EVAN P. SCHULTZ, Trial Attorney (Joseph H. Hunt, Assistant Attorney General; Stephen J. Flynn, Assistant Director, *on the brief*), Office of Immigration Litigation, U.S. Department of Justice, Washington, D.C., *for Respondent*.

————————————————

CALABRESI, *Circuit Judge*:

Petitioner Patricia Xiomara Martinez De Artiga is a citizen of El Salvador. Martinez seeks relief from threats to her and her children's lives by the infamous Mara Salvatrucha (MS-13) gang. She applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT) and listed her son Noe Antonio Artiga Martinez as a derivative beneficiary. Martinez testified credibly concerning serious, individualized threats against her and her children. The Immigration Judge (IJ) denied CAT relief due to Martinez's prompt flight from El Salvador following the gang's threats and the fact that

2

there had been no physical harm prior to her flight. The BIA affirmed. It was error for the IJ to penalize Martinez in this manner, and we cannot confidently predict that a remand would be futile. We therefore **DENY** the government's motion for summary denial, **GRANT** Martinez's petition for review, and **REMAND** the case to the BIA for further proceedings consistent with this opinion. Judge Kearse dissents in a separate opinion.

## I.

In June 2014, members of MS-13 targeted Martinez's son Noe as a potential new recruit. Gang violence in El Salvador was pervasive at that time (and still is) due to the rise of two warring groups, MS-13 and Barrio-18 (B-18), both of which trace their origins to Southern California. Their tactics are brutal and well-documented. Certified Administrative Record (CAR) at 219–303.

Gang members first approached Noe, then 10 years old and in the fifth grade, outside of his school in San Bartolomé Perulapía. They asked Noe to sell drugs inside the school and to demand money from others on behalf of the gang. When Noe refused the gang members' requests,

they told him that they would kill him and his family. CAR at 113–14, 169, 176. After this initial confrontation, the gang members threatened Noe several times each week in front of his school. *Id.* at 176.

Around the same time, the school's principal held a meeting with parents to discuss threats against at least two other students in connection with MS-13's recruitment efforts. Police officers were stationed in front of the school for a short period as a result of the meeting. Gang members returned to the front of the school after the police left.

It was at this point that Martinez began escorting Noe to and from school in order to protect him. CAR at 122–23, 169. Martinez arranged with the principal to pick up Noe at the rear entrance of the school. She was able to avoid the gang members for a short time.

Approximately two weeks later, gang members confronted Martinez outside her home. CAR at 123–24, 169. They told Martinez that they knew she was protecting Noe and that they would kill Martinez and Noe if Noe did not join MS-13. *Id.* at 124, 169. One of the gang members displayed a knife. *Id.* at 124–25, 169.

That same day, Martinez gathered her children to discuss what had happened. CAR at 124. She decided that she would flee with Noe. They left for the United States within a week. *Id.* at 125. As Martinez explained before the IJ, she took the gang members' threats seriously because she knew "the way that they punish people" and that "they always follow through with their threats." *Id.* at 115, 131.

Documents submitted by Martinez to the IJ include a report by the United Nations High Commissioner for Refugees (UNHCR) describing how MS-13 and B-18 target children for recruitment and punish their families for resisting. CAR at 292–93, 299. Martinez also submitted news reports attesting to the particularly high frequency of gang violence in San Bartolomé Perulapía and the surrounding area of Cuscatlán. *Id.* at 160–61, 198–217. Martinez provided the IJ with death certificates for two people she identified as neighbors of hers whom MS-13 had murdered. *Id.* at 192–96. The IJ, however, citing one of the news reports Martinez supplied, questioned whether the deceased might have been members of rival gangs. *Id.* at 53, 119.

Martinez and Noe arrived in the United States in July 2014 after crossing the border without inspection at or near Eagle Pass, Texas. CAR at 348, 362. Agents of the Department of Homeland Security permitted them to reunite with family members in New York.

Within months, the gang members began to harass Martinez's daughter Gabriela verbally in an attempt to determine Martinez and Noe's whereabouts. CAR at 158. The gang members' threats included telling Gabriela that they would force her to be a "sex slave" if she refused to divulge her family members' locations. *Id.*

This harassment culminated in a particularly frightening episode. In September 2016, a group of gang members blocked Gabriela's path on her way home and ordered her to accompany them to a forested area controlled by MS-13. CAR at 49, 158. They brandished knives and told Gabriela, who was pregnant at the time, that if she did not comply they would kill her and cut her child out of her body. *Id.*

Fortuitously, a relative of Gabriela's happened to be walking nearby. CAR at 49, 158. He called out to Gabriela and told her that her grandmother did not like her walking alone. *Id.* The gang members

indicated to Gabriela that she should not tell anyone about the incident and permitted her to leave. *Id.* at 158.

That very same night, Gabriela made plans to flee El Salvador and stayed at her sister's home. She left the country the next day. CAR at 49, 158. Gabriela stated in an affidavit submitted to the IJ that she believes the MS-13 members would have raped and killed her if she had followed them to the forested area. *Id.* at 158.

**II.**

DHS served Martinez and Noe with Notices to Appear upon their arrival in the United States on July 19, 2014 and filed these notices in Immigration Court on November 21, 2014. CAR at 348–49, 362–63. Martinez applied for asylum, withholding of removal, and CAT protection on July 16, 2015, listing Noe as a derivative beneficiary. *Id.* at 306-14.

Appearing without counsel, Martinez admitted at a preliminary hearing on October 7, 2015, that she had entered the country without lawful authorization. CAR at 86–87. At a merits hearing on November 16, 2016, and with the assistance of counsel, Martinez testified before the

IJ. *Id.* at 48, 103–37. She also submitted extensive documentary evidence. *Id.* at 151–303.

The IJ found Martinez to be credible and noted that her testimony "was detailed, plausible, internally consistent, and consistent with her documentary evidence." CAR at 49–50. The IJ added that Martinez "sufficiently corroborated her testimony, including her submission of statements from her three children and mother." *Id.* at 50. Nonetheless, in an unpublished decision issued on January 19, 2017, the IJ denied all forms of relief sought by Martinez.

The IJ rejected Martinez's claims for asylum and withholding, concluding that Martinez failed to demonstrate a nexus between the persecution she alleged and a protected ground. CAR at 50–52. An applicant for asylum "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). Likewise, a person seeking withholding of removal must show that his or her "life or freedom would be threatened in that country *because of* the alien's race, religion, nationality, membership in a

8

particular social group, or political opinion." *Id.* § 1231(b)(3)(A) (emphasis added). Assuming without deciding that Noe's nuclear family is a cognizable social group, the IJ concluded that MS-13 had not targeted Martinez on account of her membership in this group. CAR at 50. The IJ acknowledged that Martinez protected Noe from MS-13 "because she is Noe's mother," but determined that "it was not Respondent's status as a member of Noe's nuclear family that the gang wanted to overcome, but her interference with the gang's recruitment efforts." *Id.* at 50–51.

As to CAT protection, the IJ identified two sets of reasons for denying relief. First, the IJ observed that Martinez "was only threatened once before leaving El Salvador," that "[s]he was never physically harmed by MS-13," and that "Gabriela and Noe were also threatened, but not physically harmed." CAR at 53. Second, the IJ determined that Martinez failed to establish that her neighbors had been killed for interfering with MS-13's recruitment efforts. *Id.*

The BIA affirmed the IJ's denial of relief in a single-member decision on August 24, 2017. CAR at 2–3. The Agency agreed with the IJ

that asylum and withholding were not available because "the gang's motivation was found to be to increase its ranks and not to punish the respondent because she is a member of her son's family." *Id.* at 2. On the issue of CAT protection, the Agency did not specify reasons for affirming beyond stating that Martinez and Noe had "not met their burden of proof." *Id.*

After Martinez petitioned our Court for review, the government moved for summary denial. Dkt # 1, 38. A member of our Court, sitting on the non-argument calendar panel, transferred this case to our regular argument calendar. Dkt #61. Following transfer, the government renewed its motion for summary denial. Dkt # 93.

**III.**

**A.**

We discuss Martinez's claim for CAT protection first. An applicant for CAT relief bears the "burden of proof . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture means "any act by which severe pain or suffering, whether physical or mental,

is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 208.18(a)(1). Severe pain or suffering includes "prolonged mental harm caused by or resulting from . . . [t]he threat of imminent death." *Id.* § 208.18(a)(4)(iii).

We review the IJ's findings of fact for substantial evidence, *Gurung v. Barr*, 929 F.3d 56, 60 (2d Cir. 2019), and "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B). Findings of fact include determinations regarding the likelihood of future events. *Hui Lin Huang v. Holder*, 677 F.3d 130, 134 (2d Cir. 2012). But for the IJ or BIA to rule categorically that certain facts preclude CAT protection may be erroneous as a matter of law. When such an error is made, a remand is required unless remanding would be futile. *Gurung*, 929 F.3d at 62 (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943), and *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99 (2d Cir. 2006)). That is, we can only avoid a remand where there has been an error of law if we are

"confident that the agency would reach the same result upon a reconsideration cleansed of errors." *Li Hua Lin*, 453 F.3d at 107.

The IJ found Martinez's testimony about the individualized threats against her and her children and her country conditions evidence detailing the power and brutality of MS-13 to be credible. Yet, relying on its observations that Martinez "was only threatened once before leaving El Salvador" and that she and her children were "threatened, but not physically harmed," the IJ concluded that Martinez nevertheless failed to meet her burden. CAR at 53.

To hold categorically that an applicant for CAT relief must be threatened more than once and that such a person must suffer physical harm before fleeing is an error of law. *See* 8 C.F.R. § 208.16(c). Martinez and her children left within days of when gang members threatened them. The IJ credited Martinez's testimony that the threats received were believable and in no way remote. Under the circumstances, it was error to require that the petitioners wait until they suffered physical harm or until the threats recurred before they fled.

In light of the agency's error, we must examine whether it is obvious that without this error the agency would have reached the same conclusion. That is, whether a remand would be futile. With this in mind, we examine the credible evidence that was before the agency to see whether we can say with confidence that the agency would have reached the same result absent the error. In doing so, we are not weighing the evidence against the standard for CAT relief ourselves. Rather, we consider only whether "a) [] the IJ articulate[d] an alternative and sufficient basis for her determination; b) [] her reliance on the erroneous aspect of her reasoning is substantially tangential to her non-erroneous findings; or c) [] overwhelming evidence in the record makes it clear that the same decision is inevitable on remand." *Li Hua Lin*, 453 F.3d at 107.

Here, we cannot confidently predict that the agency would reach the same result without the error. Martinez's testimony, which the IJ credited, established that she and her children were facing a sustained campaign of violent confrontations. These included when gang members flashed a knife at Martinez and when they attempted to force

13

Martinez's pregnant daughter into a secluded area and threatened to cut her child out of her body.

The latter incident, though it occurred after Martinez had fled El Salvador, remains relevant to our analysis. The standard for CAT protection asks whether an applicant "*would* be tortured *if* removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2) (emphasis added). MS-13's continued targeting of Martinez's family undoubtedly strengthens Martinez's argument that she would have been tortured or killed had she remained in El Salvador longer and that she would be tortured or killed upon returning.

We cannot say that the IJ's second stated reason for denying Martinez's claim for CAT relief was "an alternative and sufficient basis" for its decision. *Li Hua Lin*, 453 F.3d at 107. The IJ discounted Martinez's country conditions evidence because death certificates and news articles submitted by Martinez did not show that the individuals killed by MS-13 in San Bartolomé Perulapía were murdered for interfering with gang recruitment. CAR at 53. In other words, the IJ held against Martinez the fact that she did not establish that MS-13 had killed people in her

hometown for precisely the same reason that they had threatened to kill her.

That Martinez did not produce such evidence does not render remand futile, and indeed does not necessarily undermine her claim. In fact, her testimony regarding the individualized threats she and her children received provided some support for her argument that it is more likely than not that members of MS-13 would have retaliated against her had she stayed longer and would do so now if she returns to El Salvador. Consistent with the threats against Martinez, the country conditions evidence—at the least—confirms that MS-13 retaliates against perceived opposition by committing torture and murder.

Stripped of its error regarding Martinez's prompt flight, the IJ's decision certainly recounts enough credible evidence such that it is more than possible that the agency might have otherwise concluded that Martinez met her burden for CAT relief. Accordingly, a remand on the likelihood of torture cannot be deemed futile. The agency, in deciding whether it would reach the same conclusion absent the erroneous

reliance on the speedy departure, might well wish to send the case back to the IJ for further factual development.

An applicant for CAT protection must, however, also demonstrate that "such pain or suffering [would be] inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). Under our cases, an applicant satisfies this requirement by showing that "government officials kn[e]w of or remain[ed] willfully blind to an act and thereafter breach[ed] their legal responsibility to prevent it." *De La Rosa v. Holder*, 598 F.3d 103, 109 (2d Cir. 2010) (quoting *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)). The IJ, having concluded that Martinez failed to establish a likelihood of torture, never addressed whether Salvadoran government officials were willfully blind to MS-13's actions and breached a legal responsibility to prevent harm to Martinez. If on remand the agency finds that Martinez met her burden

of demonstrating a likelihood of torture, then fact-finding by the IJ on the question of government acquiescence will be needed.[1]

**B.**

In her application for relief, Martinez also sought asylum and withholding of removal. CAR at 50–52. Before this court, Martinez argues that she faces persecution on account of her membership in her son's nuclear family and her political opinion opposing MS-13. The IJ and BIA, assuming without deciding that Noe's family is a cognizable social group, ruled that Martinez failed to meet the nexus requirement because MS-13 targeted her not on account of her membership in Noe's family but rather due to her efforts to stymie the gang's recruitment operations. Although the IJ acknowledged that Martinez protected Noe from MS-13 "because she is Noe's mother," the IJ determined that "it

---

[1] The dissent describes what the IJ held as a nuanced discussion of what suffices to meet the requirement for CAT relief. But, on any reading of the record, the IJ held that, without previous physical harm, a credible threat of being killed did not meet the requirement of torture. The IJ then went on to discuss why additional evidence presented by Martinez did not make that credible threat more than just a credible threat that she would be killed.

We therefore do not see how the IJ's decision is not a holding as a matter of law that more is necessarily required than a credible threat of death to establish a likelihood of torture. It is hence a holding that one must produce additional evidence that torture is sufficiently probable or that one must wait to be physically injured or be killed to qualify for CAT relief.

does not follow that gang members targeted her, even in part, on account of that relationship." *Id.* The IJ and BIA did not address Martinez's political opinion claim, and the government contends that this was proper, given that Martinez did not adequately raise and argue this claim.

The cognizability of social groups defined by family membership and of political opinions defined by opposition to gangs are not only fact-intensive inquiries but also issues with respect to which the approaches of the BIA and of our Court are currently in a state of flux. *See Hernandez-Chacon v. Barr*, 948 F.3d 94 (2d Cir. 2020); *Matter of L-E-A-*, 27 I. & N. Dec. 581 (U.S. Att'y Gen. 2019). Given our decision to remand, we need not address these issues now. And, in view of the present changing context, we deem it advisable to forgo any discussions at this time.

Since our remand may require fact-finding on the CAT question and the BIA may not engage in such fact-finding, 8 C.F.R. § 1003.1(d)(3)(iv), the case may ultimately return to the IJ. If this happens, the IJ may consider Martinez's political opinion and social group

18

arguments for asylum and withholding, along with any new evidence that Martinez might offer. *See Diallo v. U.S. Dep't of Justice*, 548 F.3d 232, 237 (2d Cir. 2008); *Matter of Patel*, 16 I. & N. Dec. 600, 601 (BIA 1978). Any consideration of these questions by us, if then appropriate, can await a more complete record.

## CONCLUSION

We **DENY** the government's motion for summary denial, **GRANT** Martinez's petition for review, **VACATE** the BIA's decision, and **REMAND** the case to the BIA for further proceedings consistent with this opinion.

17-2898
Martinez de Artiga v. Barr

KEARSE, *Circuit Judge*, dissenting:

I respectfully dissent from the majority's view that the Immigration Judge ("IJ")--in denying the application of petitioner Patricia Xiomara Martinez de Artiga ("Martinez") for relief under the Convention Against Torture ("CAT")-- ruled "as a matter of law," Majority Opinion *ante* at 11, that, in order to prevail, "an applicant for CAT relief must be threatened more than once and . . . such a person must suffer physical harm before fleeing," *id*. at 12. The IJ stated before his rulings on Martinez's applications for asylum, withholding of removal, and protection under the CAT, that he had "considered the totality of the circumstances," Decision of the Immigration Judge dated January 19, 2017 ("*IJ Decision*"), at 3; and in dealing with her application under the CAT, his ruling was simply that Martinez "did not meet her burden" of proving "that it is more likely than not that she would be tortured if she returns to El Salvador. *See* 8 C.F.R. § 1208.16(c)(2)," *IJ Decision* at 7.

"[D]etermination[s] of what will occur in the future and the degree of likelihood of the occurrence" are findings of fact. *Hiu Lin Huang v. Holder*, 677

1

F.3d 130, 134 (2d Cir. 2012). An IJ's finding of fact is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The majority cannot meet this standard to overturn the IJ's factual determinations in this case.

## *WHAT THE IJ ACTUALLY DECIDED*

Martinez and her son Noe fled El Salvador in 2014 after members of the MS-13 gang attempted to recruit the then-10-year-old Noe to join the gang; Noe had refused, and MS-13 members threatened to kill him or his family members if he did not agree to work for them. After Martinez began to walk Noe to and from school to protect him against further MS-13 efforts, MS-13 members threatened to kill Martinez and her family. About a week later, Martinez and Noe left El Salvador. *See IJ Decision* at 2-3. After being found in the United States, Martinez applied, on behalf of herself and Noe, for asylum, withholding of removal, and protection under the CAT.

In addressing her application for asylum, the IJ found that the reason Martinez had been threatened by MS-13 members was "to dissuade her from (and punish her for) interfering with their recruitment efforts." *IJ Decision* at 5.

2

In addressing Martinez's application for protection under the CAT, the IJ stated as follows:

> The Convention Against Torture and its implementing regulations provide that no person shall be removed to a country *where it is "more likely than not" that such person will be subject to torture. See* 8 C.F.R. §§ 1208.16, 1208.17, 1208.18. *"Torture" is "an extreme form of cruel and inhuman treatment,"* defined, in part, as the intentional *infliction of severe pain or suffering* by, or at the instigation of, or with the consent or acquiescence of a public official. 8 C.F.R. § 1208.18(a)(1)-(2) . . . . ***The applicant for CAT protection bears the burden of proof.*** 8 C.F.R. § 1208.16(c)(2). In assessing whether an applicant has met her burden, *the Court must consider all evidence relevant to the possibility of future torture*, including evidence that the applicant has suffered torture in the past. . . . 8 C.F.R. § 1208.16(c)(3) . . . .
>
> Respondent did not meet her burden in establishing that it is more likely than not that she would be tortured if she returns to El Salvador. *See* 8 C.F.R. § 1208.16(c)(2). Respondent was only threatened once before leaving El Salvador. She was never physically harmed by MS-13. Gabriela and Noe were also threatened, but not physically harmed. *Respondent provided evidence of individuals who were killed in [her home municipality]. However, the record does not show that these individuals were killed because they interfered with MS-13's attempts at recruitment.* Respondent submitted two news articles suggesting that the individuals who died were gang members who were killed *because of the rivalry between MS-13 and the Barrio 18 gang.* Other documents, such as two death certificates, *do not indicate that the deceased were killed by MS-13.* Notwithstanding the ongoing gang violence in El Salvador as reflected in the record, the Court does not find that Respondent met the high burden

3

necessary to find that *she* is likely to be tortured if she returns to El Salvador. *See* 8 C.F.R. § 1208.16(c)(2).

*IJ Decision* at 6-7 (record citations omitted) (emphases mine). Thus, the IJ described the statutory contours of torture, pointed to the statutory burden of proof imposed on Martinez as a CAT applicant, described the sporadic and entirely nonphysical nature of the Martinez family's encounters with MS-13, remarked on the lack of probative value in the evidence that Martinez proffered as to treatment by MS-13--or by others--of other persons who were not similarly situated to Martinez, and found that Martinez had not carried her burden of establishing that it was more likely than not that if returned to El Salvador she would be tortured. In sum, although the majority says that the IJ held "categorically that an applicant for CAT relief must be threatened more than once and that such a person must suffer physical harm before fleeing," Majority Opinion *ante* at 12, the IJ's opinion does not purport either to establish or to apply any such dogmatic principle.

Further, contrary to the majority's implication, there was nothing even remotely inappropriate about the IJ's consideration of what had actually happened to Martinez and her family. Substantively, as indicated above, the IJ pointed out that "[t]orture" is defined in the CAT generally as "an extreme form

4

of cruel and inhuman treatment," involving the officially sanctioned, albeit unlawful, intentional infliction of "severe pain or suffering," 8 C.F.R. §§ 1208.18(a)(1) and (2).  Further, mental torture involves "*prolonged* mental harm," including that caused by "[t]he threat of *imminent* death" to the applicant or another person.  *Id*. §§ 1208.18(a)(4)(iii)-(iv) (emphases added).  Being defined as "an extreme form of cruel and inhuman treatment," "[t]orture . . . does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  *Id*. § 1208.18(a)(2).

Procedurally, as the IJ pointed out, the regulations governing applications under the CAT include the instruction that

> [i]n assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, *all evidence relevant to the possibility of future torture shall be considered, including*, but not limited to:
>
> (i) *Evidence of past torture inflicted upon the applicant. . . .*

8 C.F.R. § 1208.16(c)(3)(i) (emphases added).  Of all the factors that could be relevant to a claim of probable future torture, whether the applicant actually suffered torture in the past appears to be the most pertinent:  It is the first example the regulation provides, and it is the only example that focuses on the

5

applicant and not, as do §§ 1208.16(c)(3)(ii)-(iv), on conditions in the country to which the applicant would be removed.

It seems obvious that an IJ cannot determine whether the applicant had been subject to torture in the past without examining the past encounters between the applicant and the claimed offender. Thus, there was nothing punitive, *see* Majority Opinion *ante* at 2 ("the IJ . . . penalize[d] Martinez" because "there had been no physical harm prior to her flight"), in the IJ's finding that Martinez had experienced but a single, unprolonged, no-contact encounter with MS-13 members, which had consisted of a threat that could not itself conceivably be construed as torture. The IJ made a factual evaluation called for by the regulation.

And, as is obvious from the language of the IJ's decision denying CAT relief, quoted above, the IJ did not view the facts that Martinez received only one threat and that no one was harmed physically as dispositive. Rather, having noted the facts as to Martinez and her family themselves, the IJ immediately proceeded to consider Martinez's evidence of violence visited upon others. Because some of her evidence apparently involved violence only by entities other than MS-13, and some involved gang wars, and none of it indicated that the

6

victims had been targeted for interfering with MS-13's efforts at recruitment, the IJ found Martinez's other evidence not probative to show "that *she*," *IJ Decision* at 7 (emphasis added), would more likely than not be tortured. The majority characterizes that evaluation of Martinez's other evidence as "the IJ's *second* stated *reason for denying* Martinez's claim for CAT relief," Majority Opinion *ante* at 14 (emphases added), and suggests that the IJ ruled that the lack of similarity in the motivations for killing others disentitled her to CAT relief as a matter of law, *see id*. at 14-15. But a finding that proffered evidence is not probative on an issue is not a ruling that its proponent loses as a matter of law; and the majority's suggestion that it became such a ruling here is not a fair reading of the IJ's decision. The IJ began by saying he had considered the totality of the circumstances; in the CAT section of his decision he discussed the events experienced by Martinez and her family and then assessed the probative value of Martinez's evidence of the experiences of others. At no point did the IJ rule that Martinez failed to meet any standard other than her statutory burden to establish the fact that if she were returned to El Salvador, it was more likely than not that she would be tortured.

7

Finally, the majority attacks the IJ's findings as to the experiences of Martinez and her family--*i.e.*, that there was little that occurred before she and Noe left El Salvador to suggest a likelihood of future torture--by stating that "Martinez's testimony, which the IJ credited, established that she and her children were facing *a sustained campaign* of *violent* confrontations." Majority Opinion *ante* at 13 (emphases added). The majority goes on to state that "[t]hese *included* when gang members flashed a knife at Martinez and when they attempted to force Martinez's pregnant daughter [Gabriela] into a secluded area and threatened to cut her child out of her body." *Id*. at 13-14 (emphasis added). As abhorrent as such threats are, I have several disagreements with the majority's statement that there was such a "sustained campaign."

First, the period between the two incidents cited by the majority spanned approximately 27 months. Yet Martinez and Noe left El Salvador a week after the first incident. Thus, if there had been a "sustained campaign of violent confrontations" for that period, Martinez would not have been a competent witness to 99 percent of it.

Second, I do not see that Martinez in fact testified, even with hearsay, that there was such a campaign of violent confrontations. Martinez testified that after

8

she left, her family was "bothered" by MS-13 gang members asking about Noe's whereabouts (Certified Administrative Record ("CAR") 126); but she mentioned no confrontation signifying violence, other than the one in 2016 involving Gabriela.

Third, the record does not support the majority's characterization of any of the confrontations as "violent." Clearly there were threats of future violence; but I do not see any assertion by any member of Martinez's family that there was actual violence. Nor is it clear to me what *additional* "violent confrontations" the majority means to suggest occurred by its use of the word "included." Aside from the flashing of knives in the summer of 2014 and the fall of 2016, I have not seen in the record a claim that there was any other display of weapons.

Fourth, I cannot see that the record indicates that there was a "sustained campaign" of even threats between the two cited events--which were more than two years apart. First, after the summer-of-2014 threat to Martinez that led her and Noe to leave El Salvador a week later, there were apparently no threats to anyone in Martinez's family for months. Gabriela--the only family member whose affidavit stated that she was even harassed by MS-13 gang members--said that MS-13 members did not "start[] bothering" her until "[s]everal months after

9

[Martinez and Noe had] left El Salvador." (CAR.158, ¶ 3.) And though she said they threatened her, she did not describe their harassment as violent:

> *At first they would just stare at me* as I was going to and from school. *After some time they started calling out to me* and demanding that I tell them the whereabouts of my mother and my brother. *They would call me ugly names and threaten me.* They told me that if I didn't tell them where my family was, I was the one who was going to pay in their place. They told me that if I didn't tell them where my family was, I would have to be their "jaina" (sex slave). *They would follow me in the streets as they insulted me and threatened me.* **This went on *(off and on)* for about a year.**

(*Id.* (emphases added).) *See also IJ Decision* at 5 (discussing Gabriela's statements).

Gabriela did not indicate that, after that "off and on" year, there were any threats or unpleasant encounters--or any more inquiries as to the whereabouts of Martinez and Noe--until her final encounter with MS-13 members in September 2016; and she did not suggest that there was any mention of Martinez or Noe in that last encounter. (*See* CAR.158, ¶¶ 3, 4.)

In sum, the record in this case shows that Martinez was threatened once before leaving El Salvador; that although MS-13 gang members threatened to kill Martinez and her family, they plainly did not threaten "imminent" death; that neither before nor after the departure of Martinez and Noe was she or anyone in her family harmed physically; that after their departure it was several months

10

before MS-13 members even asked Martinez's daughter about their whereabouts; and that although there was MS-13 harassment of that daughter "off and on" for about a year, in the rest of the 27-month interim between the MS-13 members' flashing of knives, there were periods of months when there was not even verbal harassment. The majority's assertion that the IJ denied Martinez's application for CAT relief as a matter of law enables the majority to conclude that it may properly grant Martinez's petition for review on the basis that, on remand, "the agency might . . . conclude[] that Martinez met her burden for CAT relief," Majority Opinion *ante* at 15 (emphasis added). But if the IJ's decision was, as I view it, simply that on this record Martinez did not meet her burden of establishing the likelihood that she would be tortured if she were returned to El Salvador, that is a factual determination, and it cannot properly be overturned because no "reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B).

Accordingly, I would deny the petition for review.

11