17-2284-ag
*Zelaya-Moreno v. Wilkinson*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2019

(Argued: September 27, 2019          Decided: February 26, 2021)

No. 17-2284

_____

DOUGLAS ADRIAN ZELAYA-MORENO

*Petitioner,*

-v.-

ROBERT M. WILKINSON
ACTING UNITED STATES ATTORNEY GENERAL,

*Respondent.*[*]

_____

Before:     LIVINGSTON, *Chief Judge*, POOLER and SULLIVAN, *Circuit Judges*.

Petitioner Douglas Adrian Zelaya-Moreno ("Zelaya") seeks review of a decision of the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Zelaya, who had been threatened and beaten by gang members and

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Acting Attorney General Robert M. Wilkinson is automatically substituted for former Attorney General William P. Barr as Respondent.

police officers who urged him to join the gang, sought relief primarily on two grounds. First, he claimed that the gang persecuted him because of his political opinion that gangs are bad for his town and country. Second, he sought protection under the CAT based on an asserted likelihood of future torture by, or with the acquiescence of, the police. We conclude that Zelaya's negative view of gangs does not amount to a "political opinion" within the meaning of the immigration laws, and that substantial evidence supports the BIA's decision that he has not established a likelihood of future torture if he were to be removed to El Salvador. Accordingly, the petition for review is **DENIED**.

Judge Pooler dissents in a separate opinion.

FOR PETITIONER: ROBERT C. ROSS, West Haven, CT.

FOR RESPONDENT: LORI B. WARLICK (Chad A. Readler and M. Jocelyn Lopez Wright, *on the brief*), Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.

DEBRA ANN LIVINGSTON, *Chief Judge*:

Petitioner Douglas Adrian Zelaya-Moreno ("Zelaya") seeks review of a decision of the Board of Immigration Appeals ("BIA") denying his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Zelaya, a citizen of El Salvador, testified before an Immigration Judge ("IJ") that while in El Salvador, he was threatened and beaten by gang members and police officers who urged him to join the gang. The petitioner sought relief primarily on two grounds. First, Zelaya claimed that the gang persecuted him

2

because of his political opinion that gangs are bad for his town and country. Second, he sought protection under the CAT based on an asserted likelihood of future torture at the hands of, or with the acquiescence of, the police. We conclude that Zelaya's negative view of gangs does not amount to a "political opinion" within the meaning of the immigration laws, and that substantial evidence supports the BIA's decision that he has not established a likelihood of future torture if he is removed to El Salvador. Accordingly, we deny his petition for review.

## BACKGROUND

### I. Factual Background[1]

Zelaya was born in El Salvador, on the outskirts of the town of Pasaquina, where he lived with his parents and three siblings. Zelaya asserts that on November 16, 2013, when he was twenty years old, he was approached for the first time by three members of the Mara Salvatrucha ("MS") gang who told him that he needed to join MS. Because he believed that gangs were harmful to his hometown of Pasaquina and the country of El Salvador, Zelaya refused. Two of

---

[1] The factual background presented here is derived from the factual findings of the immigration judge, which are not disputed on appeal, and the Certified Administrative Record ("C.A.R.").

3

the men then beat Zelaya, threatening that he only had two choices: join the gang or leave town. Despite the threats, Zelaya stayed in Pasaquina. He neither sought medical treatment after the beating nor told the police about the incident, fearing that they were in thrall to MS.

Zelaya attests that about two months later, on January 23, 2014, while Zelaya was exercising in front of his home, three men wearing police uniforms approached him. The police officers insulted Zelaya and beat him as they put him into a vehicle. They drove him to a house occupied by MS members. The police escorted him into the house where about ten gang members, including the local gang leader, were waiting. The leader ordered Zelaya to join the gang; once again, Zelaya refused, reiterating his belief that gangs were bad for his hometown and his country. While the police officers stood by, five gang members proceeded to beat Zelaya for his refusal to join. They slammed Zelaya against the concrete floor, fracturing his left arm. The leader eventually called off the other gang members and offered Zelaya some time to consider the gang's demand. The police returned Zelaya to where they had picked him up and urged him to consider joining the gang. This time, Zelaya sought treatment for his broken arm

4

from a local healer.  Based on their participation in the beating, he refrained from filing a formal complaint with the police.

Zelaya relates that as he was returning home from a doctor's visit on March 18, 2014—approximately two months after the second beating—he realized that a few gang members were following him.  Once again, they threatened to kill him if he did not join, but they did not physically attack him.  Zelaya claims that he remained inside his home after this incident until he was able to collect enough money from relatives to flee El Salvador.  Zelaya felt that he could not escape the gangs by going elsewhere in El Salvador because MS pervaded much of the country and the region.

On April 1, 2014, he left El Salvador, arriving at the United States border on April 13.  He was promptly arrested by border patrol agents.

## II.  Procedural History

The Department of Homeland Security ("DHS") served Zelaya with a Notice to Appear, charging him as removable for seeking admission into the United States without valid entry documents.  He ultimately conceded removability but applied for asylum, withholding of removal, and protection under the CAT.

At the hearing before the IJ, Zelaya testified to the events discussed above, and also stated that his parents and siblings remained in Pasaquina and had not been harassed by the gang since Zelaya's departure. He introduced letters from the mayor of Pasaquina and a member of the legislature attesting to his good character; various news articles indicating that El Salvador is rife with gang violence, corruption, and murder; and two reports from the U.S. Department of State—a 2015 Human Rights Report and a 2016 Crime and Safety Report—chronicling the myriad sources of corruption, violence, criminal activity, and governmental abuse in El Salvador.

In his decision, the IJ presumed that Zelaya was credible and found "that being attacked by the gang and having his arm broken does rise to the level of past persecution." C.A.R. 46. Furthermore, he concluded that Zelaya sincerely opposes gangs and that his opposition constitutes a political opinion. C.A.R. 47. Nevertheless, the IJ rejected Zelaya's asylum claim based on the IJ's conclusion that Zelaya had failed to establish that Zelaya's political opposition to gangs was a central reason for the mistreatment he recounted. Instead, the IJ attributed the conduct of Zelaya's alleged persecutors to Zelaya's refusal to join the gang, irrespective of his reasons. Absent past persecution on account of his political

6

opinion, the IJ also rejected Zelaya's claim that he had a well-founded fear of future persecution on this basis.   C.A.R. 46–48.

The IJ also rejected Zelaya's petition under the CAT.   The IJ relied primarily on the conclusion that Zelaya had not adduced sufficient evidence to establish that anyone was still planning to harm him if he returned to El Salvador. Specifically, the IJ found that "there [was] just not enough evidence that police officers are still looking for [Zelaya]," "[t]here [was] no evidence that the gang, since March of 2014, is still looking for [Zelaya]," and there was no indication that the gang would pursue Zelaya if he moved to a different part of El Salvador. C.A.R. 48–49.   The dearth of evidence that the government or the police would acquiesce in Zelaya's torture if he returned was decisive.

Zelaya appealed to the BIA.   Rather than adopting the IJ's rationale, the BIA rejected Zelaya's claim that a belief that "gangs were bad for his town and country" amounts to a political opinion.   C.A.R. 3.   In the view of the BIA, "gangs are criminal organizations and not political or government organizations and gang activities are not political in nature.   Therefore, expressing an opinion against their group is not expressing a political opinion; it is merely [Zelaya] expressing opposition to that group and its attempts to recruit him to join their

7

ranks." C.A.R. 3. As a result, the BIA did "not reach the issue of whether this opinion was one central reason for his persecution." C.A.R. 3. As to his CAT claim, the BIA concluded that "the evidence does not demonstrate that [Zelaya's] harm rose to the level of torture" and that "there [was] no evidence that the police department is looking to harm him in the future, or would acquiesce to the infliction of torture on him by others." C.A.R. 4. Accordingly, the BIA dismissed the appeal.

Zelaya timely petitioned for review of the BIA's decision pursuant to 8 U.S.C. § 1252.

## DISCUSSION

On appeal, Zelaya advances two arguments. First, he argues that the BIA erred in concluding that his anti-gang views were not a "political opinion" within the meaning of the Immigration and Nationality Act and that the BIA should have considered whether that opinion was "one central reason," 8 U.S.C. § 1158(b)(1)(B)(i), for his claimed persecution. Pet.-Appellant's Br. 10-26. Second, he contends that the BIA discounted evidence of past torture and the ease with which he could be tortured again. We address his political opinion and torture claims in turn.

8

Where, as here, the BIA's opinion does not "adopt the decision of the IJ to any extent" and is not "merely supplemental," "the [BIA] opinion becomes the basis for judicial review of the decision of which the alien is complaining." *Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005) (quotation marks omitted); *see also Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009). "'Legal issues, and the application of law to fact, are reviewed *de novo*.'" *Acharya v. Holder*, 761 F.3d 289, 295 (2d Cir. 2014) (quoting *Castro v. Holder*, 597 F.3d 93, 99 (2d Cir. 2010)) (italics added). "Our review of the factual findings of the agency, however, is considerably circumscribed: 'administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). Finally, the IJ presumed that Zelaya's testimony was credible, and the BIA did not expressly adopt or reject that presumption. Under such circumstances, we likewise presume that Zelaya's testimony was credible and determine whether the BIA's decision is correct "in the face of his assumed (but not determined) credibility." *Kayembe v. Ashcroft*, 334 F.3d 231, 235 (3d Cir. 2003), *cited with approval in Chen*, 417 F.3d at 271.

**I**

We begin with Zelaya's asylum claim, which is predicated on his belief that gangs are harmful to his hometown and El Salvador. The primary question we consider is whether, assuming such a belief is sincerely held, it amounts to a political opinion that renders Zelaya eligible for asylum. *See* 8 U.S.C. § 1158(b)(1)(B)(i); *see also* 8 U.S.C. § 1101(a)(42).

**A**

To show that persecution, or a well-founded fear of persecution, is "on account of" political opinion, 8 U.S.C. § 1101(a)(42)(A), an asylum applicant must demonstrate that a "persecutor's motive to persecute arises from the [asylum] applicant's *political belief*," *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 545 (2d Cir. 2005) (emphasis added), or from a political belief imputed to him by the persecutor, *see Delgado v. Mukasey*, 508 F.3d 702, 706 (2d Cir. 2007). Thus, not all mistreatment that might cause an individual to leave one country for another— even mistreatment arising from an individual's opinions—qualifies as persecution on the basis of *political* opinion. To be clear, political opinions may be intertwined with ostensibly non-political issues—so that evaluating what constitutes a political opinion for asylum purposes "involves a complex and contextual factual inquiry

into the nature of the asylum applicant's activities in relation to the political context in which the dispute took place." *Hernandez-Chacon v. Barr*, 948 F.3d 94, 103 (2d Cir. 2020) (internal quotation marks omitted). But to prevail on an asylum claim based on political opinion, the asylum applicant must establish three elements, the very first of which is to "specify the *political* opinion on which he or she relies."[2] *Fatin v. INS*, 12 F.3d 1233, 1242 (3d Cir. 1993) (Alito, *J.*) (emphasis added).

This Court's decision in *Osorio v. INS*, 18 F.3d 1017 (2d Cir. 1994), is illustrative of this Circuit's approach to sketching out the parameters of a political opinion claim. In *Osorio*, we considered the claim of a Guatemalan union leader. *Id.* at 1021. The BIA had denied Osorio asylum on the grounds that the persecution he suffered at the hands of the Guatemalan government was on account of economic issues—the union advanced interests such as "better terms and conditions of employment, or higher wages"—not politics. *Id.* at 1029–30. We reversed and criticized the BIA for "ignor[ing] the underlying political context of the dispute" and the "political dynamics in Guatemala." *Id.* at 1030. We

---

[2] The asylum applicant must also "show that he or she holds that opinion," and "show that he or she would be persecuted or has a well-founded fear of persecution based on that opinion." *Fatin*, 12 F.3d at 1242.

11

observed that, "in a country where the standard of living is low, and where the government suppresses civil liberties and commits widespread human rights violations, unions (and student organizations) are often the only vehicles for political expression." *Id.* at 1029–30; *see also id.* at 1030 (rejecting "an impoverished view of what political opinions are, especially in a country like Guatemala where certain democratic rights have only a tenuous hold"). Thus, although the Guatemalan government ostensibly targeted a non-political entity (a union), it did so "because the government view[ed] union activities as subversive" and in "opposition to government policies." *Id.* at 1030; *see also id.* at 1030–31 (union activities "clearly evince the political opinion that strikes by municipal workers should be legal and that workers should be given more rights," even if they are not directly affiliated with a political philosophy or party). We also noted that, while an asylum claim must be founded on "persecution on account of the *victim's* political opinion," *Elias-Zacarias*, 502 U.S. at 482, or one imputed to him, *see Hernandez-Chacon*, 948 F.3d at 104-05, the political motives of the persecutor constitute "some evidence . . . of the appropriate characterization of the dispute" and may well constitute "the only evidence of the victim's political beliefs, other than the testimony of the victim himself or herself," *Osorio*, 18 F.3d at 1030.

12

*Osorio* thus teaches that the context in which alleged persecution occurs is critical to evaluating political opinion claims. In other words, the "political opinion" inquiry is highly context-dependent and fact-intensive. Nevertheless, some propositions are relatively straightforward. Thus, we have recognized that when a given country is combatting guerillas or insurgents who seek to overthrow the government, disagreement with such groups can sometimes amount to a political opinion. *See, e.g.*, *Delgado*, 508 F.3d at 707; *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 35, 37 (2d Cir. 1994). Likewise, expressing pro-democracy views averse to an authoritarian regime may constitute the basis for a political opinion claim. *See, e.g.*, *Baba v. Holder*, 569 F.3d 79, 81–82 (2d Cir. 2009); *Gjolaj v. Bureau of Citizenship and Immigr. Servs.*, 468 F.3d 140, 141, 143 (2d Cir. 2006). And the Third Circuit has expressed "little doubt that feminism qualifies as a political opinion within the meaning of the relevant statutes" in appropriate cases, so that in some countries an asylum applicant's "deep-rooted beliefs in . . . equality of opportunity for both sexes" might give rise to persecution or a well-founded fear of persecution. *Fatin*, 12 F.3d at 1237, 1242 (quotation marks omitted); *see also Hernandez-Chacon*, 948 F.3d at 104–05 (discussing possibility that feminist, anti-patriarchy opinion may be political).

Still, determining whether an applicant's evidence establishes a political opinion can be challenging. For instance, in discussing an asylum applicant's opposition to governmental corruption, we have differentiated between situations in which an "applicant's actions were 'directed toward a governing institution, or only against individuals whose corruption was aberrational.'" *Yueqing Zhang*, 426 F.3d at 548 (quoting *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir. 2004)). The former category—involving challenge to a "governing institution"—may evince a political opinion, whereas simply resisting the extortionate demands of a corrupt official may not. To guide this inquiry, we may look at whether the "opposition to corruption transcends self-protection and represents a challenge to state-sanctioned modes of official behavior." *Ruqiang Yu v. Holder*, 693 F.3d 294, 298 (2d Cir. 2012). Indicators that an asylum applicant is engaging in political activity, rather than seeking redress for a personal grievance, include that the applicant "undertook to vindicate the rights of numerous other persons," *id.* at 299, "decided to marshal support from similarly afflicted [people] and . . . attempt[ed] to publicize and criticize endemic corruption extending beyond his own case," *see Yueqing Zhang*, 426 F.3d at 547. *See also Kyaw Zwar Tun v. INS*, 445 F.3d 554, 569–70 (2d Cir. 2006) (participating in activities of pro-democracy group

14

and attending demonstrations establishes a political opinion); *accord Matter of N-M-*, 25 I. & N. Dec. 526, 528 (BIA 2011) ("Campaigning against state corruption through classic political activities such as founding or being active in a political party that opposes state corruption, attending or speaking in political rallies on the issue of eradicating state corruption, or writing or distributing political materials criticizing state corruption would likely constitute the expression of political opinion . . . ."); *cf. Urgilez Mendez v. Whitaker*, 910 F.3d 566, 571 (1st Cir. 2018) ("To impute a political opinion premised on an individual's holding of that opinion, we have required, at a minimum, evidence that the would-be persecutors knew of the political beliefs and targeted the belief holder for that reason." (emphasis, quotation marks, and brackets omitted)).

Yet despite the weight we assign to such public activities, political opinions may expose an individual to persecution even when the asylum applicant has not mobilized other people to a cause. *Cf. Ruqiang Yu*, 693 F.3d at 299 ("The fact that the protests organized by Yu challenged corruption at a *single* workplace does not render the corruption categorically aberrational without regard to the nature of Yu's conduct." (emphasis added)). Thus, we have held that the "reporting of official corruption" may be "inherently political" when viewed in the relevant

context. *Castro*, 597 F.3d at 100–01. For example, where an officer blew the whistle on corruption in the ranks of the Guatemalan police force, we held that he expressed a political opinion against "the new regime['s] reviv[al] . . . of the corrupt aspects" of a prior era, even though he only reported the corruption to supervisors and "to a United Nations watchdog agency." *Id.* at 101, 104. These acts were not publicized in the sense that they were widely disseminated and they did not represent a broad call to action, but we nevertheless concluded that they could be perceived "as striking a political blow against the Guatemalan government," especially because the whistleblower spoke to an agency "created as part of a political accord between rival factions and designed to support human rights and the rule of law." *Id.* at 104; *see also Volaj v. Holder*, 383 F. App'x 52, 53–54 (2d Cir. 2010) ("Volaj's husband's letter [to the Prime Minister] challenged both the governing institution [a local communal government] and [its head] individually. Consequently, the letter could be considered inherently political.").

*Castro* thus suggests that while one need not broadcast one's beliefs to the entire world to hold beliefs that are political in nature, these beliefs and actions taken in support of them must have some political ambition in mind—or, for an imputed claim, must be perceived in this manner. *See Saldarriaga v. Gonzales*, 402

16

F.3d 461, 466 (4th Cir. 2005) (noting that "whatever behavior an applicant seeks to advance as political, it must be motivated by an ideal or conviction of sorts before it will constitute grounds for asylum"). As the Fourth Circuit has articulated it, "'[F]ears of retribution over purely personal matters or general conditions of upheaval and unrest do not constitute cognizable bases for granting asylum.'" *Id.* (quoting *Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 284 (4th Cir. 2004)); *see also Campos-Guardado v. INS*, 809 F.2d 285, 290 (5th Cir. 1987) ("Congress did not intend to confer eligibility for asylum on all persons who suffer harm from civil disturbances—conditions that necessarily have political implications."). Thus, it is insufficient to bemoan generally poor conditions in a country—and even if those conditions are caused by broadly applicable policies or laws. *Cf. Jin Jin Long v. Holder*, 620 F.3d 162, 166 (2d Cir. 2010) ("As a rule, the enforcement of generally applicable law cannot be said to be on account of the offender's political opinion, even if the offender objects to the law."); *Yueqing Zhang*, 426 F.3d at 545 ("[W]here the applicant's political belief takes the form of opposition to a government policy or practice that is visited on the population at large, mere subjection to that policy or practice will not itself qualify as persecution 'on account of' political opinion."). Nor is it sufficient that the alleged opinion merely has some trifling political

17

dimension.  *Khatri Chhetri v. Holder*, 553 F. App'x 81, 83 (2d Cir. 2014) ("Hostile actions by paramilitary groups are not *per se* acts of persecution based on imputed political opinion simply because those groups have political aims." (italics added)); *Olcese v. Mukasey*, 295 F. App'x 446, 448 (2d Cir. 2008) (in context, fear "that corrupt police officers would target [petitioner] because of his prior position as a photographer in the investigations unit of the police department in Argentina . . . does not implicate a political opinion"); *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1288 (11th Cir. 2020) ("[T]he fact that the government and a revolutionary group are fighting to achieve political objectives does not imbue every act committed by them with political significance" as "harm and threats that may incidentally result from behavior meant to achieve a political objective" may not rise to the level of persecution on account of political opinion. (brackets and quotation marks omitted)); *Kozulin v. INS*, 218 F.3d 1112, 1116 (9th Cir. 2000) ("[T]he mere presence of some political element does not require the conclusion that some maltreatment was on account of political opinion.").

Rather, to qualify as a "political opinion," an opinion must involve some support for or disagreement with the belief system, policies, or practices of a government and its instrumentalities, *see, e.g.*, *Castro*, 597 F.3d at 100–04; *Yueqing*

18

*Zhang*, 426 F.3d at 548; *Tun*, 445 F.3d at 569–70; an entity that seeks to directly influence laws, regulations, or policy, *see, e.g.*, *Osorio*, 18 F.3d at 1029–31; an organization that aims to overthrow the government, *see, e.g.*, *Delgado*, 508 F.3d at 707; *Sotelo-Aquije*, 17 F.3d at 35, 37; or a group that plays some other similar role in society, *cf. Sagaydak v. Gonzales*, 405 F.3d 1035, 1042–45 (9th Cir. 2005) (in context, state auditor who uncovered tax-evasion scheme in a private company and refused to accept bribes or "abdicate his duty to testify" against the company held a political opinion supporting the state's efforts to eliminate misuse of its financial resources). And actions that challenge or seek to change policies or practices serve as stronger evidence of a political opinion when they are not wholly self-serving.

**B**

With this legal backdrop in mind, we turn to Zelaya's claim that he expressed his political opinion when he told members of the MS gang in El Salvador, in substance, that "gangs are bad for my town and country." For the reasons set forth below, we conclude that Zelaya's anti-gang views do not constitute a political opinion so as to satisfy the first element of Zelaya's asylum

claim. Accordingly, the BIA did not err in determining that Zelaya failed to establish his eligibility for asylum.

The BIA held that "refusing to join a gang without more does not constitute a political opinion." C.A.R. 3 (citing *Matter of E-A-G-*, 24 I. & N. Dec. 591 (BIA 2008)). We agree with this conclusion as a general matter. *See Vasquez v. Holder*, 343 F. App'x 681, 683 (2d Cir. 2009) ("Vasquez argues that his opposition to the gang lifestyle was itself a political opinion. This argument is unavailing."); *Prieto-Pineda v. Barr*, 960 F.3d 516, 521 (8th Cir. 2020) ("Although the Mara 18 gang may have some political motivations, the record here supports a finding that Prieto-Pineda was harassed for refusing to provide rides [to gang members], not for any political opposition to the gang."); *Valdiviezo-Galdamez v. Att'y Gen.*, 663 F.3d 582, 609 (3d Cr. 2011) ("Valdiviezo–Galdamez offers no higher authority [beyond an unpublished IJ decision] to support his contention that his refusal to join the Mara Salvatrucha was, by definition, the expression of a political opinion."); *Ramos-Lopez v. Holder*, 563 F.3d 855, 862 (9th Cir. 2009) ("[Ramos] alleges no facts in support of a political opinion, actual or imputed, beyond his refusal to join the MS–13. Thus, the IJ's determination that Ramos did not prove persecution on account of a protected ground is supported by substantial

20

evidence."), *abrogated on other grounds by Henriquez-Rivas v. Holder*, 703 F.3d 1081 (9th Cir. 2013) (en banc); *Rivera-Barrientos v. Holder*, 666 F.3d 641, 647 (10th Cir. 2012) ("Rivera Barrientos [must] show that her attack was motivated by more than anger at her unwillingness to join MS–13 and a desire to coerce her into joining.").

Nevertheless, the BIA's analysis of why Zelaya's statement to the MS members does not qualify as "more" is flawed in one respect. The BIA suggested that "gangs are criminal organizations and not political or governmental organizations." C.A.R. 3. But as we recognized in *Osorio*, under appropriate circumstances, even overtly apolitical or nongovernmental organizations may take on a political valence such that support or opposition to them can constitute a political opinion. *See Osorio*, 18 F.3d at 1029–30. Thus, while we may have previously intimated that an action ought to be directed at a "governing institution" to qualify as a political opinion, *see Yueqing Zhang*, 426 F.3d at 548, we have never held that *only* opinions pertaining to the government or its instrumentalities qualify as "political." Instead, we have recognized that guerrilla groups may espouse political views such that opposition to such anti-government organizations may also support an asylum claim. *See, e.g., Delgado*, 508 F.3d at 707; *Sotelo-Aquije*, 17 F.3d at 35, 37. Accordingly, to the extent the BIA

21

suggested that non-governmental organizations can *never* operate in a political arena, we have never adopted such a *per se* rule and decline to do so now.

The BIA was on sturdier ground, however, in its determination that so far as the administrative record here reveals, MS is a criminal organization in El Salvador, and not a political one—that "gangs are criminal organizations and . . . gang activities are not political in nature." C.A.R. 3. While our Circuit has not yet had the opportunity to consider whether an anti-gang opinion, when expressed to gang members, can constitute a political opinion that may form the basis of an asylum claim, other circuits have considered analogous situations. The Ninth Circuit has even reviewed a claim originating from El Salvador and based on interactions with MS. *See Santos-Lemus v. Mukasey*, 542 F.3d 738 (9th Cir. 2008), *abrogated on other grounds by Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013) (en banc). Although the petitioner in *Santos-Lemus* was not the subject of gang recruitment, he, like Zelaya, claimed that he had been threatened and beaten multiple times by MS gang members and that he fled the country out of fear of further violence. *Id.* at 740. And, like Zelaya, Santos-Lemus "assert[ed] he is entitled to refugee protection because he was persecuted based on his anti-gang 'political opinion.'" *Id.* at 746. The Ninth Circuit ultimately concluded that

22

"[t]he Board's determination that a general aversion to gangs does not constitute a political opinion for asylum purposes [is] reasonable." *Id.* at 747. In reaching that conclusion, the Ninth Circuit noted that there was "[n]o evidence . . . that the gang held any sort of belief system that they perceived Santos-Lemus to oppose," let alone that "he was politically or ideologically opposed to the ideals espoused by the Mara or to gangs in general." *Id.*

A similar rationale applies here. Zelaya's sole "political" statement amounts to "gangs are bad." That statement is certainly true. But disapproving of things that have a negative impact on one's life or even one's country does not necessarily amount to a *political* opinion. And this is particularly so in the absence of any evidence in the administrative record that MS or other gangs advocate for a political agenda or that gangs employ tactics in service of a political philosophy. Even when an applicant opposes a harsh *government* policy, when such policy "is visited on the population at large, mere subjection to that policy" does not itself qualify as persecution "on account of" political opinion because the applicant has in no way been singled out for reprisal because of his belief. *Yueqing Zhang*, 426 F.3d at 545; *Jin Jin Long*, 620 F.3d at 166. Along similar lines, opposition to criminal elements such as gangs, even when such opposition incurs

the enmity of these elements, does not thereby become *political* opposition simply by virtue of the gang's reaction.

A useful comparison is the Ninth Circuit decision in *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 740–41 (9th Cir. 2009). There, a woman was threatened after she told members of "a violent, revolutionary Communist group" that "she was 'pro-government,'" "would not enlist" with them, and disapproved of "their organization because they kill people, women and children." *Id.* at 734. The court treated those statements as expressing a political opinion. *See id.* at 736. But the political context was highly relevant: Borja expressed her opposition to a group with an avowed ideological bent that "actively oppose[d] the Philippine government." *Id.* at 734. Indeed, in rebuffing their demand for money, she identified as "pro-government" and disapproved of their violent methods. *Id.*

Conversely, Zelaya has neither established that MS similarly operates with a political motivation nor even identified a specific position or practice of the gang that he opposes. Instead, he asserts in a conclusory fashion that "gangs, which dominate the violence overrunning El Salvador, are a political as well as a criminal problem. They [a]ffect every aspect of [Salvadoran] life. Between extortion,

24

murder, drug trafficking, and corruption of public officials, they touch every [Salvadoran] on an almost daily basis." Pet.-Appellant's Br. 18. But the mere fact that gangs are pervasive does not render them political. As the Fourth Circuit has explained:

> Even when a widespread conflict between a foreign government and an opposing non-state actor overshadows [the numerous personal altercations that invariably characterize economic and social relationships], . . . a party seeking political opinion asylum must do more than describe how this overshadowing has affected his life. To receive protection as a refugee, he must also demonstrate that he has a particular stake in the conflict and a position on how governance in that country ought to occur.

*Saldarriaga*, 402 F.3d at 467. Or, as we have stated more succinctly, "general crime conditions are not a stated ground" for asylum. *Melgar de Torres v. Reno*, 191 F.3d 307, 314 (2d Cir. 1999).

Our holdings in *Delgado*, 508 F.3d 702, and *Hernandez-Chacon*, 948 F.3d 94, are rooted in the same critical distinction drawn by the Fourth Circuit in *Saldarriaga* between political violence and the regrettably ordinary violence that mars life in so many places. For instance, in *Delgado*, we faulted the BIA for failing to consider an imputed political opinion claim where the petitioner had been kidnapped by "the Revolutionary Armed Forces of Colombia ('FARC'), an anti-government terrorist organization" to help them set up a computer network, fled

25

Colombia so that she would not have to cooperate with FARC, opposed FARC's murderous tactics, and "belonged to a political party." 508 F.3d at 704, 707. The context in Colombia was such that opposition to FARC rose to the level of a political opinion, as FARC, an organization with an overtly Communist ideology, sought to overthrow the government and was "responsible for large numbers of . . . political murders" in service of that goal. *Id.* at 704. Similarly, in *Hernandez-Chacon*, we remanded for further consideration of a political opinion claim, explaining that the IJ and BIA had failed adequately to consider the relevant political context even though the petitioner cast her refusal to submit to a gang member's sexual advances as based on her "right" to resist rape and affirmed her opposition to "a culture that perpetuates female subordination and the brutal treatment of women." 948 F.3d at 102-03; *cf. Fatin*, 12 F.3d at 1237, 1242. In other words, the petitioner in *Hernandez-Chacon* arguably took a position that the gang members might have viewed as representing not only her interests, but those of women more generally. And in this circumstance, we concluded simply that it was incumbent upon the IJ and the BIA to at least consider whether her potential persecutors would have interpreted that position as a political opinion and persecuted her on account of it. *See Elias-Zacarias*, 502 U.S. at 482.

26

Conversely, Zelaya's disagreement with the gangs is no different than any other person who disapproves of criminal elements in his or her society. So far as the record shows, his objection to them is not rooted in any sort of disagreement with the policies they seek to impose nor any ideology they espouse. *See Santos-Lemus*, 542 F.3d at 747. He alludes to widespread corruption in the Salvadoran government, military, and police, which he attributes to gang infiltration, but he does not assert that he blew the whistle on such corruption, campaigned against it, joined a party or organization opposing it, or otherwise brought attention to the issue within his community. *Cf. Ruqiang Yu*, 693 F.3d at 299 ("[T]he record indicates that Yu had no personal, financial motive to oppose the corruption, undertook to vindicate the rights of numerous other persons as against an institution of the state (a state-owned factory), and suffered retaliation by an organ of the state—the police."); *Yueqing Zhang*, 426 F.3d at 547 ("Where the dispute is such that the asylum seeker did not merely seek economic advantage but mounted a challenge to the legitimacy and authority of the ruling regime itself, and where the applicant can show that this 'political threat' is the motive for the persecution perpetrated or feared, the applicant can meet the definition of a 'refugee.'"). Indeed, Zelaya concedes that he only expressed such views privately to his family.

27

And, when confronted by the gang, he merely told them that they are "bad."  This is insufficient to establish that Zelaya's "resistance . . . took on a political dimension by transcending mere self-protection."  *Hernandez-Chacon*, 948 F.3d at 104.

In sum, Zelaya has failed to differentiate himself from "all persons who suffer harm from civil disturbances," *Campos-Guardado*, 809 F.2d at 290, or widespread criminality.  He offers no evidence that MS possesses an ideology or stance that he opposes, that "he has a particular stake" in how gangs operate, or "a position on how governance in [El Salvador] ought to occur."  *Saldarriaga*, 402 F.3d at 467.  To be sure, we require neither that Zelaya articulate his politics with extraordinary eloquence or erudition nor that he take sides in a civil war between insurgent guerillas and the government.  But we require something more than the generalized statement "gangs are bad."  Thus, we cannot conclude that Zelaya holds a political opinion within the meaning of the statute, and therefore that the BIA erred in concluding that he was not eligible for asylum on this ground.

## II

We now turn to Zelaya's CAT claim.  "The Attorney General . . . may not remove an alien to a country where the alien would face . . . torture."  *Guerra v. Shanahan*, 831 F.3d 59, 61 (2d Cir. 2016).  An applicant for withholding of removal

28

under the CAT must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see also Suzhen Meng v. Holder*, 770 F.3d 1071, 1076 (2d Cir. 2014); *Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004). "Torture is defined as the infliction of severe pain or suffering by, at the instigation of, or with the consent or acquiescence of a public official." *De La Rosa v. Holder*, 598 F.3d 103, 106 (2d Cir. 2010); *see also see also* 8 C.F.R. § 1208.18(a) (defining torture as "an extreme form of cruel and inhuman treatment" comprised of "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity").

"In assessing whether it is more likely than not that an applicant would be tortured," we consider "all evidence relevant to the possibility of future torture . . . including, but not limited to: (i) Evidence of past torture . . . ; (ii) Evidence that the applicant could relocate . . . ; (iii) Evidence of gross, flagrant or mass violations of human rights . . . ; and (iv) Other relevant information regarding [country] conditions . . . ." 8 C.F.R. § 1208.16(c)(3). We review findings of fact for substantial evidence, and "questions of law regarding what evidence will suffice

29

to carry any . . . applicant's burden of proof" *de novo*. *Joaquin-Porras v. Gonzales*, 435 F.3d 172, 181 (2d Cir. 2006).

The BIA concluded that Zelaya's "credible testimony demonstrates that he suffered harm by three police officers" when they "insulted him, beat him, 'arrested him,' took him to a private house occupied by some gang members, acquiesced in the gang members beating him up and told him to join the gang." C.A.R. 4. Nevertheless, the BIA ultimately found that this harm neither "rose to the level of torture" nor established "that the police department is looking to harm him in the future, or would acquiesce to the infliction of torture on him by others." *Id.* Zelaya contends that the BIA's reasoning is infected with error in that it disregards the severity of his prior injuries—the beatings resulted in a broken arm—and the inherent dangers in relocating or avoiding future harm where the police were involved in his torture.

Whether prior acts of violence rise to the level of torture depends on the interplay between many factors, including severity, duration, effects, and means of carrying them out. *See, e.g.*, *Ay v. Holder*, 743 F.3d 317, 322 (2d Cir. 2014) (being "kicked, punched, and slapped after being arrested by . . . security forces" is not torture where the petitioner "did not require medical treatment as a result");

30

*Chowdhury v. Wordtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 52 (2d Cir. 2014) ("powerful electric shocks administered to the body" by "a paramilitary unit of the . . . [n]ational [p]olice" constitute torture when "the shocks are sufficiently severe").

Here, we need not decide where on the spectrum of violence Zelaya's case falls. Even assuming that the two beatings he recounts, one of which resulted in a broken arm that required medical treatment, rose to the level of torture, Zelaya still has not established a sufficient likelihood of future torture. *Meng*, 770 F.3d at 1076; *see also id.* ("Past torture does not give rise to a presumption of future torture. Rather, it serves as evidence of the *possibility* of future torture."). In other words, we discern no legal error in the BIA's determination that Zelaya failed to show that it is more likely than not that he will suffer future serious harm if he returns to El Salvador.

Despite the prior beatings, Zelaya did not suffer any physical violence for over three months prior to his departure. His family members remain in El Salvador unharmed. And he was able to leave without any interference from either the gang or the police. In this regard, the facts alleged by Zelaya are not qualitatively different from those alleged in other cases where we have declined

31

to overturn a denial of withholding of removal under the CAT. *See Meng*, 770 F.3d at 1076–77 ("a *possibility* of future torture . . . . cannot be converted into the requisite *likelihood*" where petitioner remained in home country "for more than 10 months without experiencing any further harm," authorities "allow[ed] [petitioner] to travel outside [the country]," and family "remain[ed] [in the country] unharmed" (second emphasis added)); *Cruz v. Holder*, 558 F. App'x 104, 106 (2d Cir. 2014) ("[T]he IJ considered the evidence of gang violence, but reasonably concluded that Cruz did not establish a likelihood of torture, particularly in light of his testimony that his family remained unharmed in El Salvador."); *Periyathamby v. Holder*, 528 F. App'x 68, 71 (2d Cir. 2013) ("Periyathamby testified that he was slapped and threatened by members of the navy, but that he was able to safely reside in another part of Sri Lanka for over two months, and that his mother and sister remained in Sri Lanka without incident. . . . [T]he IJ reasonably found that his claims did not demonstrate a likelihood that he would be subject to torture if he were removed to Sri Lanka.").

Moreover, Zelaya offers no evidence that the same three police officers would continue to beat him if he returned to El Salvador. *Cf. Mu-Xing Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003) ("Wang failed to establish that his alleged

32

previous beating was anything more than a deviant practice carried out by one rogue military official. And there is no evidence in the record that Wang would be placed under the supervision of that same lieutenant if returned to China."). As to his ability to relocate, Zelaya only put forward generalized statements about the pervasiveness of gangs and gang violence. Without more "particularized evidence to support [his] claim," Zelaya's general assertions add little to to suggest that the BIA erred in its conclusion that Zelaya failed to establish it.[3] *Mu Xiang Lin v. U.S. Dep't of Justice*, 432 F.3d 156, 160 (2d Cir. 2005); *see also Sanusi v. Gonzales*, 445 F.3d 193, 201 n.10 (2d Cir. 2006) (per curiam); *Molina-Avila v. Sessions*, 907 F.3d 977, 984 (7th Cir. 2018) ("Molina-Avila identifies no record evidence which conclusively demonstrates that the Mara 18 controls all of Guatemala."). Thus, the BIA's conclusion that Zelaya failed to establish a likelihood of future torture was supported by substantial evidence.

---

[3] Zelaya asserts that he is entitled to a presumption that he cannot relocate because his torturers are government agents (*viz.*, the police). But the regulation upon which he relies, 8 C.F.R. § 1208.13(b)(3)(ii), pertains to asylum. For CAT claims, the regulations do not provide for a presumption or burden-shifting. *See* 8 C.F.R. § 1208.16(c); *see also Maldonado v. Lynch*, 786 F.3d 1155, 1163–64 (9th Cir. 2015) (en banc) ("[T]he [CAT] regulations [do not] shift the burden to the government because they state that the applicant carries the overall burden of proof."). *But see Bathula v. Holder*, 723 F.3d 889, 904 (7th Cir. 2013) (suggesting that the burden shifting framework may apply to CAT claims).

## CONCLUSION

We have considered Zelaya's remaining arguments and find them to be without merit. Accordingly, for the foregoing reasons, we DENY the petition for review.

POOLER, *Circuit Judge*, dissenting:

Over the past decade, American politicians and law enforcement figures have treated the country to lurid descriptions of the crimes of the Mara Salvatrucha ("MS") gang.[1] As citizens of this country were showered with a steady parade of dire warnings of the threat of this gang by their elected leaders, Douglas Adrian Zelaya-Moreno sought refuge here after standing up to MS members, refusing their demands that he join them, and informing them that he did not support them and considered them a blight on his native El Salvador. Our asylum laws protect individuals like Zelaya-Moreno who face persecution for such politically courageous stands.

Similarly, the Convention Against Torture ("CAT") protects individuals where the record indicates "it is more likely than not that [they] would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

---

[1] *See, e.g.*, President Donald J. Trump, Remarks by President Trump in Briefing on Keeping American Communities Safe: The Takedown of Key MS-13 Criminal Leaders (Jul. 15, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-briefing-keeping-american-communities-safe-takedown-key-ms-13-criminal-leaders/; Fenit Nirappil & Laura Vozzella, *Gillespie Rolls Out 'Kill, Rape, Control' Attack Ad against Northam*, WASH. POST (Sept. 29, 2017), https://www.washingtonpost.com/local/virginia-politics/gillespie-quietly-rolls-out-second-kill-rape-control-attack-ad-against-northam/2017/09/28/8540cd24-a46f-11e7-8cfe-d5b912fabc99_story.html.

MS members broke Zelaya-Moreno's arm in the presence of three police officers. He was threatened with death when he visited a doctor, on the only occasion he left his home in the three months prior to his departure from the country. Given that he faced death threats the only time he appeared in public in El Salvador after standing up to MS and its police allies, the record clearly indicates that it is more likely than not that Zelaya-Moreno will be tortured if he is removed to El Salvador.

As I would find that the Board of Immigration Appeals ("BIA") erred in both its finding that Zelaya-Moreno did not express a political opinion regarding his opposition to MS and that there was not a likelihood of torture, I respectfully dissent.

The majority provides an accurate description of the facts in the record and the legal background here, so I limit my discussion to our areas of disagreement. I begin with the question of whether Zelaya-Moreno's statement to a local MS leader that he would not join the gang because "[it] was bad for [his] city [and] for [his] country" was a political statement. Certified Admin. R. ("C.A.R.") at 90.

As the majority notes, the BIA has held that "refusing to join a gang without more does not constitute a political opinion." C.A.R. 3 (citing *Matter of E-*

*A-G-*, 24 I. & N. Dec. 591 (BIA 2008)). Our Court has accepted this holding in unpublished decisions, and this case does not require us to reexamine this decision. *See Sanchez-Ponce v. Whitaker*, 757 F. App'x 18, 20 (2d Cir. 2018); *Vasquez v. Holder*, 343 F. App'x 681, 683 (2d Cir. 2009).

This case does not involve refusal to join a gang "without more." Zelaya-Moreno did not simply flee to avoid the gang's recruitment efforts but on two occasions took public stands against the gang. First, he told gang recruiters that he would not join because the gang was bad for El Salvador and his hometown. MS responded by beating Zelaya-Moreno and then telling him that he would need to join the gang or leave the town. Evidently displeased by Zelaya-Moreno's public challenge to the gang and its role in El Salvador, the local MS gang boss had police arrest Zelaya-Morena, assault him, and bring him to a safe house. The gang leader told Zelaya-Morena that he must join the gang, and he responded that he would not because the gang was bad for El Salvador and the town. The gang members responded with a more brutal assault, breaking Zelaya-Moreno's arm with the acquiescence of the watching police officers.

As the majority correctly notes, the BIA did not address why this evidence was insufficient to demonstrate that Zelaya-Moreno's opposition to MS was

3

political. The BIA simply stated that "gangs are criminal organizations and not political or governmental organizations." C.A.R. 3. This is clearly incorrect as we have repeatedly held that nongovernmental organizations frequently take on the roles of political actors in societies, and opposition or support of such groups can constitute a political opinion. *See Osorio v. I.N.S.*, 18 F.3d 1017, 1029-31 (2d Cir. 1994) (holding that support for unions and economic rights for workers constituted a political opinion in Guatemala). The BIA's blanket statement that gangs are not political organizations is an incorrect statement of the law and suggests a curious lack of understanding of the politics of Central America, a region from which many asylum claims originate. One does not have to look hard to find reports of collaboration between El Salvador's government and MS itself.[2] The majority rightly rejects this blanket statement but errs when it analyzes the facts of this case.

In El Salvador, where political figures, including multiple presidents, stand accused of working with MS, Zelaya-Moreno informed the gang members publicly that he considered them dangerous for the country. After making this

---

[2] *See, e.g.*, Anna-Cathrine Brigida, *El Salvador's Government Cut Deals with MS-13 Gang in Bid to Reduce Killings, Report Says*, WASH. POST (Sept. 5, 2020), washingtonpost.com/world/the_americas/el-salvador-gangs-violence/2020/09/05/8fb8734e-eee3-11ea-bd08-1b10132b458f_story.html.

statement, the gang attempted to force him to join a second time, suggesting that the gang was aware that the public challenge to their role in El Salvador harmed them and co-opting a critic would neutralize this threat. When Zelaya-Moreno stood his ground a second time, he did so in the presence of not only gang members but agents of the state. He did not merely express some generalized aversion to gangs; he publicly challenged the gang and its police allies for their role in El Salvador.

I agree with the majority that the Ninth Circuit decision in *Borja v. I.N.S.*, presents a useful comparison. 175 F.3d 732 (9th Cir. 1999), *superseded by statute on other grounds as stated in Parussimova v. Mukasey*, 555 F.3d 734, 740–41 (9th Cir. 2009). Like Borja, Zelaya-Moreno was threatened after he told members of a violent non-governmental organization that he "would not enlist" with them and disapproved of their violent and destructive role in El Salvador. *Borja*, 175 F.3d at 734. In that case, the Ninth Circuit noted, "Ms. Borja did not waver from her political refusal to join the [insurgent group], remaining in their eyes their political adversary. Once Ms. Borja drew a political line in the sand, her every contact with the [organization] became a life or death situation[.]" *Id.* at 736. This mirrors Zelaya-Moreno's situation, as he twice refused MS's demands and drew

5

his own political line in the sand. Thereafter he was marked for death, remaining imprisoned in his home, and facing death threats on the one occasion he left to seek medical treatment.

The majority argues that the situations are distinct, as the group in *Borja* had an avowed communist ideology, opposed the Philippine government, and Borja expressed her opinion as pro-government. These distinctions of fact do not rebut the obvious similarities in the two cases. While the insurgent group in *Borja* had a communist ideology, Borja did not express any sentiments regarding Marxism or the proper functioning of an economic system. *See id.* at 734. She merely stated that she did not approve of their violence. *Id.* Similarly, Zelaya-Moreno did not provide a treatise on the damage that MS was causing to El Salvador, he simply stated that they were damaging his country. While Borja expressed her opposition to a group that opposed the Philippine government, Zelaya-Moreno expressed his opposition to a group in alliance with at least some aspect of the police forces. Clearly, he would not have said that he was "pro-government," *Borja*, 175 F.3d at 734, as he challenged an organization tied to the government. The political salience of standing before an armed group in alliance with agents of the state and describing them as bad for your country is no

different than standing before an armed group in opposition to agents of the state and expressing your opposition to their role. Zelaya-Moreno should not be punished merely because his tormentors were more successful in building alliances with their government than Borja's tormentors.

The majority misapplies decisions from other circuits to suggest that they have rejected the argument that opposition to gang's role in a country expressed directly to gang members does not constitute a political opinion. In *Santos-Lemus v. Mukasey*, the petitioner claimed that he had faced threats and attacks from MS and fled the country in fear of further attacks. 542 F.3d 738, 740 (9th Cir. 2008), *abrogated on other grounds by Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013), He also sought asylum on the basis of his anti-gang "political opinion." *Id.* at 746 (internal quotation marks omitted). As the majority points out, the Ninth Circuit rejected this claim, but the opinion pointed to facts that clearly distinguished Santos-Lemus' case from Zelaya-Moreno's. The holding's key paragraph makes the distinctions plain, "Santos–Lemus provided no evidence that his opposition to the gang's criminal activity was based on political opinion. Santos–Lemus also did not present evidence that he was politically or ideologically opposed to the ideals espoused by the Mara or to gangs in general,

7

or that the Mara imputed to Santos–Lemus any particular political belief." *Id.* at 747. Here, Zelaya-Moreno did present evidence that his opposition was based on a political opinion, as he disapproved of the role MS played in society and told them so. Zelaya-Moreno presented evidence that he was opposed to the ideas of MS and gangs in general, twice stating these beliefs publicly and facing reprisals for doing so. MS clearly found these opinions to be a direct challenge to its authority, as it responded to these beliefs with ever more violent efforts to co-opt its opponent. *Santos-Lemus* provides no basis for finding against Zelaya-Moreno.

The majority faults Zelaya-Moreno for failing to assert specific positions or practices of MS that he opposes. The majority considers his statements that "gangs, which dominate the violence overrunning El Salvador, are a political as well as a criminal problem. They [a]ffect every aspect of [Salvadoran] life. Between extortion, murder, drug trafficking, and corruption of public officials, they touch every [Salvadoran] on an almost daily basis," Appellant's Br. 18, to express mere generalized concerns about crime conditions, which would not entitle him to asylum, *see Melgar de Torres v. Reno*, 191 F.3d 307, 314 (2d Cir. 1999). This is an uncharitable and unnecessarily narrow reading of Zelaya-Moreno's argument. Zelaya-Moreno clearly invokes the long history of corrupt

8

partnerships between the state and gangs, and he expressed his opposition to this role by informing both gang and state agents that he stood against their role in El Salvador.

The majority invokes the Fourth Circuit's holding distinguishing a claim based on pervasive in-country violence and one based on political beliefs. *See Saldarriaga v. Gonzales*, 402 F.3d 461, 467 (4th Cir. 2005) ("[A] party seeking political opinion asylum must do more than describe how [a pervasive societal conflict] has affected his life. To receive protection as a refugee, he must also demonstrate that he has a particular stake in the conflict and a position on how governance in that country ought to occur."). Zelaya-Moreno does have such a stake; he took a public stand against MS with its ties to every level of government and described his desire for an El Salvador that was free of its terror. The Fourth Circuit has recognized anti-gang political opinion in Central America can form a valid basis for a political asylum claim. *See Alvarez Lagos v. Barr*, 927 F.3d 236, 251 (4th Cir. 2019) ("[I]f, as Alvarez Lagos alleges, [the gang] has imputed to her an anti-gang political opinion, then that imputed opinion would be a central reason for likely persecution if she were returned to Honduras."). The majority writes, "Zelaya's disagreement with the gangs is no different than

9

any other person who disapproves of criminal elements in his or her society." Maj. Op. at 26. Sadly, in so describing Zelaya-Moreno's statements, the majority effectively deems a public stand against MS in El Salvador in the presence of corrupt police officers akin to a complaint from a New Yorker regarding rising crime rates at a community board meeting.

In our recent decision in *Hernandez-Chacon v. Barr*, we remanded to the BIA for its failure to adequately address a political opinion claim. 948 F.3d 94 (2d Cir. 2020). In that case, the petitioner's purported political opinions stemmed from her refusal to submit to a gang member's sexual advances. *Id* at 102-03. She described this refusal as "a stance against a culture of male-domination." *Id.* at 102-03. We held that the BIA failed to consider how her repeated refusals of these advances could be seen as a challenge to MS authority. *See id.* at 103. "Hernandez-Chacon's resistance arguably took on a political dimension by transcending mere self-protection to also constitute a challenge to the authority of the MS gang." *Id.* at 104. Here, Zelaya-Moreno's challenge to the authority of the MS gang was not arguable, it was direct. Zelaya-Moreno stood before MS and challenged their role in El Salvador. The majority does not see how this public challenge transcended self-protection, but this seems clear to me. One can

attempt to avoid gang recruitment in many ways, but directly informing gang leaders that you oppose them and what they stand for is no way to do so, if one is merely seeking self-protection. Zelaya-Moreno's stance was not merely about his own life but his desire for a better life for his fellow El Salvadorans.

Zelaya-Moreno expressed his opposition to MS in El Salvador where that gang has a clear role in the political life of the country. The Department of Justice says such opposition is not political. Yet, in our own country, where the threat of MS is arguably far lower, the former head of the executive branch, surrounded by top Department of Justice leaders, stood before the country and treated opposition to MS as a political distinction between him and his opponents.[3] In other words, the prior leaders of the executive branch were comfortable treating their own opposition to MS as political but not the statements of someone who challenged MS on its home turf.

I would reverse the BIA's decision as to whether Zelaya-Moreno's statement constituted a

---

[3] *See, e.g.*, President Donald J. Trump, Remarks by President Trump at a Roundtable Discussion on Immigration (May 23, 2018) (quoting the President as saying, "I noticed recently, where Democrats — Nancy Pelosi, as an example — are trying to defend MS-13 gang members."), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-roundtable-discussion-immigration-bethpage-ny//.

political opinion and remand for further consideration of whether it constituted a central ground for his persecution.

Finally, I briefly address the issue of relief under CAT. Here too, I part ways with the majority's application of the standard to the facts of this case.

First, the majority largely passes over the BIA's unsupportable decision that Zelaya-Moreno's injuries did not rise to the level of torture, because it decides based on likelihood of future torture. As I would remand the case, I address this point to make clear that neither ground for denial of relief under CAT was appropriate. The BIA did not offer any explanation of why two beatings—the second of which resulted a broken arm that has yet to heal—did not constitute torture. While our Court has held that an individual who was kicked, punched, and slapped was not tortured, we explicitly noted the absence of medical treatment as a determinative factor in that case. *See Ay v. Holder*, 743 F.3d 317, 322 (2d Cir. 2014). The standard for torture is whether the abuse involves the intentional infliction of "severe pain or suffering." 8 C.F.R. § 1208.18(a)(1). In this case, five individuals beat Zelaya-Moreno until he suffered potentially permanent damage to his health. This is clearly harm that rises to the level of torture.

12

The majority states, "[d]espite the prior beatings, Zelaya-Moreno did not suffer any physical violence for over three months prior to his departure," Maj. Op. at 31. However, the record is clear as to the reason for this absence of physical attacks. Zelaya-Moreno remained imprisoned in his home for that three-month period with the exception of one visit to a doctor to treat his broken arm. He testified that the one time he left his home, the gang again threatened him: join or be killed. Given that Zelaya-Moreno's only attempt to leave his home was met with death threats, he did not enjoy any safety in his country. Furthermore, while the majority opinion emphasizes the three-month period between the beating and his departure, Zelaya-Moreno only stayed in the country two weeks after receiving treatment for his broken arm. In essence, the majority states that individuals must attempt to depart their home countries with untreated broken limbs or have their CAT claims denied based on their failure to flee quickly enough.

In support of its position regarding timing, the majority cites three cases, all of which are inapposite. In *Meng v. Holder*, the petitioner remained in her home country for ten months with no indications that she was imprisoned in her home, faced death threats when she left it, or delayed departure to recover from

13

untreated injuries. 770 F.3d 1071, 1076-77 (2d Cir. 2014). Similarly, in *Periyathamby v. Holder*, the petitioner remained for two months and provided no indication that he was imprisoned in his home or recovered from injuries in that time. 528 F. App'x 68, 71 (2d Cir. 2013). In *Cruz v. Holder*, the petitioner did not discuss prior confrontations with the gang or police allies and relied simply on pervasive gang violence in his home country. 558 F. App'x 104, 106 (2d Cir. 2014). Given these clear distinctions, it is unclear on what basis the majority concludes that "the facts alleged . . . are not qualitatively different from those alleged in other cases where we have declined to overturn a denial of withholding of removal under the CAT." Maj. Op. at 31.

As for his family remaining, there is no indication in the record that any member of his family explicitly told MS that they were a problem for the country. His family members did not publicly challenge gang authority in the presence of the gang's law enforcement allies. The majority does not explain why his family members are appropriate comparisons.

Finally, the majority argues that there is no indication that these same officers would beat Zelaya-Moreno if he returned to the country. This is not the proper standard for withholding of removal under CAT. The question is not

14

whether the police would beat Zelaya-Moreno, but whether they would take any action to protect Zelaya-Moreno if he went to the police for help. *See Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004). The record contains indications that the police would not act to protect him, as members of the police force delivered him to the gang, stood by during a beating, did not arrest the perpetrators, and encouraged him to join the gang—suggesting that they had no intention of protecting him in the future. *See id.* (defining acquiescence as awareness of harm and breach of legal responsibility to prevent it).

The majority is correct that the corruption of some officers does not demonstrate the corruption of all officers, but Zelaya-Moreno put forward enough evidence to raise doubts as to the reliability of El Salvador's police. S*ee De La Rosa v. Holder*, 598 F.3d 103, 109-10 (2d Cir. 2010). The country conditions evidence shows rampant and widespread corruption in the police force in El Salvador. *See, e.g.*, C.A.R. at 228 (State Dep't's 2015 El Salvador Human Rights Report describing "several allegations of extrajudicial killings that suggested police involvement" and "2,202 complaints of human rights violations, 92 percent of which alleged human rights violations committed by the National Civilian Police and the military"), 212 (2016 ABC news article explaining that

"[c]ritics say government officials are either in league with the gangs or forming illegal vigilante death squads to retaliate").

Where a petitioner has presented this type of country conditions evidence as to widespread acquiescence in torture by the security forces, the BIA has an obligation to at least consider it. Here, the BIA did not. In such cases, remand is warranted for the agency to fully consider the country conditions evidence in the first instance. *See Xiao Ji Chen v. U.S. Dep't of Just.*, 471 F.3d 315, 334-35 (2d Cir. 2006) (reasoning that this Court's "limited role as an appellate court does not permit [it] to engage in an independent evaluation of the cold record"). Accordingly, the agency's acquiescence finding warrants remand for consideration of whether the authorities are likely to help Zelaya-Moreno or turn a blind eye to MS's actions.

## CONCLUSION

In sum, Zelaya-Moreno bravely expressed his opposition to one of the world's most dangerous gangs, and he asks this country to help protect him. One would hope that our country would jump at such an opportunity to provide shelter to a brave man. Instead, the majority ignores the context of Zelaya-Moreno's words to dismiss their political salience and brushes aside his

16

harrowing three months in El Salvador to suggest he has little to fear from returning.

While it may be too late for Zelaya-Moreno, the BIA and the Department of Justice can right this wrong for future asylum seekers. I urge them to reconsider their approach to anti-gang political opinion cases to ensure those who stand up to fearsome dangers are welcomed into this country rather than forced back to face torture and death. For the foregoing reasons, I respectfully dissent.